In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3550

ELIZABETH BLACK,

*Plaintiff-Appellant,*

*v.*

LONG TERM DISABILITY INSURANCE,
sponsored by MILWAUKEE WORLD
FESTIVAL, INC. as plan administrator,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 C 1230—**Lynn Adelman,** *Judge.*

ARGUED MAY 28, 2009—DECIDED SEPTEMBER 18, 2009

Before EVANS, WILLIAMS, and TINDER, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* For many years Elizabeth Black served as executive director of Milwaukee World Festival, Inc. ("MWF"), the organization that operates Summerfest, an annual 11-day music festival in Milwaukee, Wisconsin. As a benefit of her employment with MWF, Black received long-term disability insurance

coverage under an insurance plan ("the Plan") that is underwritten and administered by Standard Insurance Company. In August 2003, Black informed MWF's president that she was disabled and could no longer work due to multiple aortic aneurysms and high blood pressure. She applied for long-term disability benefits, but Standard denied her claim and her later appeal. Black filed this suit in the district court under the Employee Retirement Income Security Act of 1974 ("ERISA"), *see* 29 U.S.C. § 1132(a)(1)(B), and both parties moved for summary judgment. Applying the arbitrary and capricious standard of review, the district court affirmed Standard's denial of benefits.

Black appeals, arguing, first, that we should review Standard's denial of benefits de novo and, second, that even under a deferential review, Standard abused its discretion by ignoring evidence and unreasonably deferring to its own consulting physicians rather than Black's treating physicians. The Plan's language, however, unambiguously grants Standard discretion in its benefits determinations. Our review, therefore, is under the deferential arbitrary and capricious standard. Because Standard permissibly credited five consulting physicians who each concluded that Black's condition is not disabling, we conclude that Standard's decision is rationally supported by the record, and we affirm the judgment of the district court.

## I. BACKGROUND

At the age of 55, Black was diagnosed with multiple aortic aneurysms, which are weakened and bulging

areas in the aorta, the body's main supplier of blood. *See* MayoClinic.com, "Aortic Aneurysm," http://www.mayoclinic.com/health/aortic-aneurysm/DS00017. Black underwent surgery at the Cleveland Clinic in March 2001 to repair aneurysms of the ascending aorta and aortic arch. Her doctor recommended that she attempt to medically manage a third aneurysm, located in the descending aorta. Black returned to work six weeks after surgery, and by the summer of 2001, she had, by her own account, "recovered well enough to run the festival to a record year." Dr. Brian Griffin of the Cleveland Clinic continued to monitor Black's remaining aneurysm, while her local cardiologist, Dr. David Slosky, monitored her blood pressure and hypertension.

After Summerfest 2001, Black sought a renewal of her employment contract for an additional five-year term to begin after her contract expired on December 31, 2003. MWF, however, deferred consideration of Black's contract until 2002. And by the end of 2002—in the midst of contract negotiations—Black's relationships with her co-workers had become strained, and she accused them of harassment and verbal abuse. In December 2002, Black sent a letter to counsel for MWF, detailing her complaints and reiterating her desire for a new contract. In that letter Black stated that she had a possibly life-threatening illness that allowed her "to be fully functional at this time, but which is reactive to stress, not the day-to-day operational kind, but the unnecessary stress that comes from degrading, disparaging and harassing conduct."

Black also solicited letters from her treating physicians for use in her contract negotiations. In a letter addressed to Black's attorney in November 2002, Dr. Griffin wrote that Black "has significant hypertensive problems . . . it is vital that her blood pressure be well controlled. Stress, particularly in the form of verbal abuse, is very deleterious for her blood pressure control." In a similar letter sent in December 2002, Dr. Slosky wrote that Black "has significant hypertension . . . [h]er blood pressure is quite labile and reactive to stressful conditions. It is particularly sensitive to acute and direct confrontation. . . . The patient should not be subject to harassment of this kind." Finally, Dr. Eric Maas, Black's treating neurologist, also wrote a letter, stating that "any undue stress should be minimized given [Black's] medical history particularly with regard to hypertension and her vascular disease." He explained that Black "had been undergoing a great deal of stress stemming from her responsibilities as Director of Summerfest in Milwaukee and her contract negotiations," and he requested "that these factors be taken into account in planning these negotiations with Elizabeth."

Six months later, in July 2003, the personnel committee of MWF's board of directors voted not to renew Black's contract. On August 6, 2003, Black initiated a disability claim with Standard. In a letter to MWF's board of directors, Black stated that her medical condition prevented her from performing her duties as executive director, that her doctors had advised her that she was disabled and could no longer work, and that her condition had been aggravated by her job activities and job-related stress.

In reviewing her claim, Standard obtained medical records from Black's treating physicians, Drs. Griffin and Slosky, as well as her psychiatrist, Dr. Michael Deeken. Dr. Griffin monitored Black's descending aorta bi-annually after her surgery in 2001. Black's MRI scans showed that immediately after surgery, her descending aorta measured 4.7 cm in diameter. In May 2002, the size had increased to 5.0 cm but remained stable and unchanged as of September 2003. Dr. Griffin completed Standard's "Attending Physician Statement" in which he reported that on September 9, 2003, he advised Black to stop working because of her poor blood pressure control and severe stress. In a separate letter to Standard, he wrote that "given the nature of her current position . . . she is unable to adequately maintain a normal blood pressure." He further stated that Black should "avoid any stressful managerial type position . . . or work that requires her to be under media scrutiny or where she needs to meet time deadlines."

Dr. Slosky saw Black approximately once a year to monitor her blood pressure, and in August 2001 his records reflected that Black reported no fatigue and her cardiac status was stable except for "poorly controlled hypertension." In July 2002, Black again reported no fatigue and was "asymptomatic," with a blood pressure reading reflecting mild hypertension. In July 2003, one month before her disability claim, Black's blood pressure was normal; she reported no fatigue; and Dr. Slosky concluded, "[f]rom a cardiac standpoint, I feel that we finally achieved some stability, however, I have recommended that she make an attempt to further decrease the stress in her life, as that would help

in decreasing the lability of her blood pressure." Two months later, however, in a statement to Standard, Dr. Slosky wrote that Black should cease working due to poor blood pressure control and the "potential for aneurysm enlargement/dissection." Dr. Deeken reported that he had been treating Black since 1990 for generalized anxiety disorder, and as of February 2004, Black had a diagnosis of depressive disorder, which was in remission, and generalized anxiety disorder.

Black also submitted evidence that the Social Security Administration ("SSA") had approved her application for disability benefits. The SSA found Black disabled as of August 7, 2003, with a primary diagnosis of aortic aneurysm and a secondary diagnosis of anxiety disorders. Black was also found disabled by the Paul Revere Life Insurance Company, with which she had additional coverage.

After reviewing this evidence, Standard denied Black's claim, finding that she did not meet the Plan's definition of disabled.[1] Black filed an administrative appeal with Standard, submitting additional evidence and claiming

---

[1] The Plan's definition of disabled states:

> You are disabled from your Own Occupation if, as a result of physical Disease, Injury, Pregnancy or Mental Disorder:
>
> 1. You are unable to perform with reasonable continuity the material duties of your Own Occupation; and
>
> 2. You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.

fatigue and psychological and cognitive impairment as additional grounds for disability. Included in her additional evidence was a neuropsychological evaluation conducted in August 2004 by Dr. Thomas Hammeke, who found that Black performed at an average-to-superior level in tests of intellectual and executive functioning but displayed mild skill deficits and concentration problems. That same month Dr. Maas noted that Black had reported recent memory problems. Black also submitted letters from her family and friends stating that she had suffered extreme fatigue and cognitive impairment since her surgery in 2001. Finally, Black presented an assessment by a vocational expert who concluded that, based on her physical limitations and the duties of her position, she could no longer perform her job.

Standard consulted four board certified physicians and one board certified psychiatrist who each reviewed Black's medical records and other evidence submitted by both Black and MWF. All five consulting physicians concluded that Black's medical condition did not prevent her from performing her job and that she is not disabled. Dr. Theodore Kleikamp, board certified in internal medicine, acknowledged that stress can impact blood pressure and negatively affect an aortic aneurysm. But, given Black's relative stability since 2001, he concluded that "it is not clear that the claimant's blood pressure has been adversely affected by stress."

Dr. Ronald Fraback, board certified in internal medicine, concurred with this assessment but recom-

mended that Standard consult a cardiologist. Accordingly, Standard consulted with two cardiologists, Dr. Kent Williamson and Dr. Storm Floten. Dr. Williamson, board certified in cardiology and a vascular surgeon, noted that a reduction in stress lowers the risk of an aneurysm rupture but concluded that Black's condition could be accommodated and managed with medication. He noted that Black's MRI scans had not shown a "significant change in the descending aortic diameter." Dr. Williamson further observed that "there is no solid evidence that blood pressures within the range recently reported [by Black] are linked to an increased risk of rupture of thoracic aortic aneurysms such as Ms. Black's." Dr. Floten, also board certified in cardiology and a thoracic surgeon, opined that Black's aneurysm had not been affected by the stress of her job, noting that the "descending aorta has not enlarged significantly in the last three years." He concluded that Black was not disabled.

Finally, Dr. Esther Gwinnell, board certified in psychiatry, determined that Black's claim of fatigue and cognitive difficulties were not supported by her medical records. Dr. Gwinnell specifically noted Dr. Slosky's records, which consistently show that Black reported "no recent fatigue." She also reviewed the neuropsychological testing by Dr. Hammeke and noted that, for the most part, Black tested in the normal to above normal range.

Standard ultimately denied Black's claim on January 28, 2005. Black appealed to the district court, where the parties filed cross-motions for summary judgment. The district court granted the Plan's motion and denied Black's. Black now appeals to this court.

## II.  ANALYSIS

### A.  Standard of Review

Our review of the district court's ruling on the cross-motions for summary judgment is de novo, and so, like the district court, we directly review Standard's determination. *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860 (7th Cir. 2009). Our review of an administrator's ERISA benefits determination is de novo unless the language of the plan gives the employee adequate notice of the administrator's discretion to shape the application, interpretation, and content of the plan's rules. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 639-40 (7th Cir. 2005). If that discretion is clear from the language of the plan, we will set aside an administrator's decision only if it is arbitrary and capricious. *See Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 332 (7th Cir. 2000).

Black argues that the language of the Plan fails to clearly convey Standard's discretionary authority. But we have previously reviewed the relevant provision of Standard's benefits plan[2] and determined that the "language unam-

---

[2] The Plan's allocation of authority provision reads, in relevant part:

> Except for those functions which the Group Policy specifically reserves to the Policy owner or Employer, we [Standard] have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve

(continued...)

biguously communicates the message that payment of benefits is subject to Standard's discretion." *Gutta v. Standard Select Trust Ins. Plans*, 530 F.3d 614, 619 (7th Cir. 2008). In *Gutta*, we noted that although Standard's plan does not use the word "discretion," it uses a number of equivalent terms that convey its discretionary authority. *Id.*; *see Herzberger*, 205 F.3d at 331 (reiterating that no magic words are necessary to convey discretion).

Nevertheless, Black argues that we should reconsider our interpretation of Standard's plan in light of *Woods v. Prudential Insurance Co. of America*, 528 F.3d 320 (4th Cir. 2008), decided two weeks before *Gutta*. In *Woods*, the Fourth Circuit expressly aligned itself with this circuit's precedent, emphasizing the need to distinguish between language that merely conveys the authority to administer the plan and that which conveys discretion. *See Woods*, 528 F.3d at 323 (citing *Herzberger*, 205 F.3d at 332). But *Woods* provides no reason to overrule *Gutta*, in which we also explicitly rejected the plaintiff's argument that the Plan merely conveys authority to Standard. *Gutta*, 530 F.3d at 619. We explained that read as a whole, the Plan clearly gives notice that Standard has the discretion required to trigger the arbitrary and capricious standard of review. *Id.*

---

[2]  (...continued)

all questions arising in the administration, interpretation, and application of the Group Policy. Our authority includes, but is not limited to . . . [t]he right to determine . . . [e]ntitlement to benefits.

Additionally, Black argues that even if the arbitrary and capricious standard applies, that review must be "more rigorous" given Standard's inherent conflict of interest as both the plan administrator and payor of benefits. Black relies on the Supreme Court's recent decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), in which the Court held that a plan administrator's conflict of interest is just one of the many factors to be taken into consideration within the context of a deferential review. Black contends that in so holding, the Court "required a change in the application of the scope of court review," and notes that the Court cited *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), and *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951), as support for this proposition. But the Court cited those cases merely as examples in which it refrained from creating "special burden-of-proof rules" and simply instructed reviewing courts to take a particular factor into account as part of the overall fact-specific review. *See Glenn*, 128 S. Ct. at 2352. Moreover, we have already considered and rejected the argument that *Glenn* requires a "heightened arbitrary and capricious standard." *See Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 831 (7th Cir. 2009). As we explained then, we read *Glenn* as an extension of the principle established in *Firestone*, 489 U.S. at 115, that an administrator's conflict of interest must be weighed as a factor along with all other relevant factors. *Leger*, 557 F.3d at 831. While we must take its conflict of interest into account, Standard remains entitled to the deference normally afforded under the arbitrary and capricious standard. *See Glenn*, 128 S. Ct. at 2350.

**B.   Benefit Denial Not Arbitrary and Capricious**

Under the arbitrary and capricious standard of review, we may overturn a benefit administrator's decision only if the decision is "downright unreasonable." *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007). Although this standard is deferential, it is not a "rubber stamp," and we will not uphold a denial if the administrator fails to provide specific reasons for rejecting evidence and denying the claim. *Id.*; *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 324 (7th Cir. 2007). In reviewing those reasons and the denial as a whole, however, we look only to ensure that the decision has rational support in the record. *See Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008).

Standard's decision here is supported by the record. As Standard explained to Black in a letter denying her claim, five consulting physicians reviewed the medical records and statements from Black's treating physicians and, based on their reviews of the objective blood pressure readings and MRI scans, determined that Black's condition was stable and had not been negatively impacted by the stress of her job. Although she did have difficulty controlling her blood pressure, Dr. Slosky's records show that her blood pressure reading was normal and she had achieved cardiac stability just one month before she claimed disability. Standard considered the reports of Black's treating physicians in the context of her employment history and concluded that those reports were designed to support Black's pursuit of another contract in 2002 and her disability claim in 2003

after the board voted not to renew her contract. Black herself wrote in 2002 that, despite her medical condition, she remained "fully functional" and able to withstand the ordinary occupational stress of her position. Finally, Standard's psychiatrist reviewed Black's medical records and found little objective support for her claims of fatigue and cognitive difficulties. This was sufficient rational support for Standard's denial of Black's claim. *See Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 408-09 (7th Cir. 2004) (holding that despite claimant's stressful job and diagnosis of coronary artery disease, hypertension, and gout, insurer had presented rational basis for denying benefits based on physician reports that claimant was stable and asymptomatic). Black contests this determination, arguing that Standard unreasonably deferred to its own physicians, ignored her claims of fatigue and cognitive impairments, and disregarded her social security disability determination, which, she contends, requires us to place greater weight on Standard's inherent conflict of interest. We consider each argument in turn.

### 1. Standard's Reliance on Consulting Physicians

Black takes issue with the conclusions of Standard's consulting physicians and Standard's decision to credit those opinions over those of her two treating physicians. This dispute, however, is essentially a contest of competing medical opinions, and under our deferential standard of review, we must defer to Standard's choice between competing medical opinions so long as it is rationally supported by record evidence. *See Semien v.*

*Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006); *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 578 (7th Cir. 2006).

Black contends that Standard's reliance on its consulting physicians was unreasonable because the physicians were wrong in their assessments that her blood pressure was under control and simply "cherry picked" words like "stable" and "asymptomatic" from the records to support their findings.[3] Black also takes issue with individual doctors' reports, contending that Dr. Kleikamp was mistaken that attempts to control her blood pressure were insufficient and that Dr. Williamson's report inaccurately stated that her aneurysm had not increased in size. She further argues that all of Standard's doctors ignored the risks of occupational stress on her aortic aneurysm and arbitrarily refused to credit the reports of the two treating physicians.

The record shows, however, that the two internists and two cardiologists each reviewed and commented on the blood pressure readings and MRI results in

---

[3] Black also argues that we should discount all of the consulting physicians' reports for their lack of firsthand clinical knowledge in accordance with Federal Rules of Evidence 602 and 802. The Federal Rules of Evidence, however, do not apply to an ERISA administrator's benefits determination, and we review the entire administrative record, including hearsay evidence relied upon by the administrator. *See Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 622 n.4 (7th Cir. 2008).

Black's records. Black is correct that words like "stable" and "asymptomatic," without more, are not determinative, but these notations are supported by the July 2003 comment by Dr. Slosky that "[f]rom a cardiac standpoint, I feel that we finally achieved some stability." In May 2004, Dr. Slosky further noted that Black's blood pressure had been adequately controlled. After evaluating these records, Dr. Kleikamp concluded that Dr. Slosky's internal chart notes were inconsistent with his statements to Standard in which he supported Black's claim. Both Drs. Williamson and Floten noted the increase in size of Black's descending aorta but concluded that the 0.3 cm-increase was not medically significant. Drs. Kleikamp, Fraback, and Williamson all agreed that stress can raise blood pressure, which, in turn, can lead to a rupture of an aortic aneurysm. Those three doctors, however, each concluded that the risk of rupture *in Black's case* was not disabling and had not been affected by occupational stress.

Therefore, contrary to Black's assertion, Standard's decision is not comparable to that in *Lasser v. Reliance Standard Life Insurance Co.*, 344 F.3d 381, 391 & n.12 (3d Cir. 2003), where the administrator simply disregarded the risk that stress posed for the claimant's heart condition because the record lacked "actual proof" supporting the probability that the risk would occur. Rather, the doctors' explanations of their findings here show that they adequately considered Black's clinical test results and independently assessed the probability that occupational stress would cause her aneurysm to rupture. They disagreed, however, with the conclusion of Black's

treating physicians that her condition was disabling. Ultimately, Standard's consulting physicians presented thorough and reasonable explanations for their determinations, and Standard was permitted to give them credence.

Standard further credited its consulting physicians based on its determination that Black's treating physicians' opinions about her ability to perform her job were internally inconsistent and shifted to support her disability claim. As Standard notes, Black sought a five-year contract extension in late 2002, and her doctors supported that effort with letters that primarily warned against stress related to contract negotiations and specific difficulties she was having with co-workers, including "verbal abuse" and "direct confrontation." Black herself wrote at that time that the normal stress of her job, "the day-to-day operational kind," was not a risk to her health. In 2003, however, Black's doctors changed their position and wrote that she could no longer handle the day-to-day stress of her job. Standard contends that the objective findings in Black's medical records do not warrant this shift because no significant medical change in Black's condition occurred between late 2002 and August 2003.

Black counters that it was inappropriate for Standard to rely on non-medical information about her employment history, and that the consulting physicians' opinions were tainted by their access to this information. Black relies on *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009), for the proposition that providing consulting physicians with non-

medical information that portrays the claimant in a nega-
tive light increases the risk of bias and suggests pro-
cedural unreasonableness. In *DeLisle*, however, the claim-
ant's employer informed the administrator that she
had been terminated for cause and provided no further
documentation or explanation. *Id.* The court explained
that this information, which was provided to the con-
sulting physicians, was incomplete and irrelevant to
DeLisle's claim that her neck, back, and closed-head
injuries prevented her from working. *Id.* And although
the court took issue with the conclusions the admin-
istrator derived from non-medical evidence, including
DeLisle's attempts to continue working, *id.* at 447-48, it
is not necessarily unreasonable for an administrator to
rely on non-medical information, particularly when the
plan gives the administrator wide discretion in the
types of evidence it may consider, as it does here, *see*
*Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 794, 806 (10th
Cir. 2004). Unlike the information reviewed in *DeLisle*,
the consulting physicians here received a detailed history
of Black's employment, which was especially relevant
in light of her claim that her condition was negatively
affected by the stress of her job. This information
provided relevant context for the medical evidence as
well as the various recommendations provided by Black's
treating physicians. And based on this information and
the apparent inconsistencies in the treating physicians'
reports, Standard was permitted to credit the consulting
physicians' opinions that Black was not disabled.

### 2. Black's Claims Adequately Considered

Black next contends that Standard failed to consider her claims of fatigue and cognitive impairments, which she describes as symptoms of her blood pressure medication and a result of her 2001 surgery. As support for these claims, Black submitted letters from her family and friends as well as results from Dr. Hammeke's neuropsychological testing, and Dr. Maas's review of that test. The parties disagree about whether the testing reflects Black's condition as of her 2001 surgery or only as of August 2004, when she was no longer covered by the Plan.

Even assuming that the test results are applicable to the relevant period of Plan coverage, Standard's consulting psychiatrist Dr. Gwinnell reasonably concluded that the test results and family letters were inconsistent with Black's medical records from 2001 to 2004. Dr. Gwinnell noted that Dr. Slosky's reports from exams in July 2002 to January 2004 explicitly state that Black reported no symptoms of fatigue. Only once, during an exam in April 2004, did Dr. Slosky note fatigue in Black's chart. Similarly, Dr. Deeken, Black's psychiatrist, did not note any cognitive difficulties or fatigue in her record. Dr. Gwinnell further concluded that the neuropsychological testing revealed average-to-superior ability in intellectual and executive functioning, and she did not believe the test supported the presence of cognitive deficits as of August 2003. Dr. Kleikamp, who also reviewed the test results, noted that although the test revealed "very mild neuropsychiatric changes," Black

was generally functioning at "average to above average levels." Therefore, Standard sufficiently considered her claims, and its rejection of them is rationally supported by the record.

### 3.  Social Security Determination Adequately Considered

Finally, Black contends that following the Supreme Court's decision in *Glenn*, Standard failed to adequately address her Social Security disability determination and that in light of this, Standard's inherent conflict of interest as both administrator and payor of claims requires reversal. We are not persuaded by this argument. When the Social Security Act's disability standard is different from that in the ERISA plan, a Social Security determination is just one more factor for consideration in an ERISA benefits determination. *See Mote*, 502 F.3d at 610; *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1046 (7th Cir. 2004). In *Glenn*, the Supreme Court explained that the claimant's Social Security determination was particularly relevant because the administrator urged the claimant to argue to the SSA that she could do no work and claimed a portion of her resulting Social Security benefits, but later ignored the SSA's determination that she was disabled. *Glenn*, 128 S. Ct. at 2352. These conflicting positions persuaded the Court that the administrator's conflict of interest deserved additional weight. *Id.* More generally though, the Court explained that the significance of an administrator's conflict of interest "will depend

upon the circumstances of the particular case," *id.* at 2346, and in a case where the factors to be considered are closely balanced, that conflict may act as a tiebreaker in finding that the determination was arbitrary and capricious, *id.* at 2351.

Here, Standard reviewed Black's Social Security determination and discounted that finding of disability because the SSA did not review the same information that Standard obtained from its consulting physicians or her relevant employment history. Standard has not taken conflicting positions with respect to Black's Social Security application, nor is there any evidence that its conflict of interest played a role in Black's case. Black contends that Standard has a pattern of arbitrarily crediting its consulting physicians and that those doctors' findings have drawn criticism from the courts. But there is nothing in this record to suggest that the consulting physicians failed to consider all of the evidence or were biased against Black's claim. Nor were their opinions so weak or ill-reasoned that this is one of those borderline cases described by the Supreme Court, where Standard's conflict of interest becomes the tiebreaking factor. *See id.*; *Jenkins*, 564 F.3d at 861-62. Rather, Standard's denial of Black's claim was rationally supported by evidence in the record, and its conflict of interest—just one additional factor that we consider—does not require reversal. Although others reviewing Black's medical condition in the first instance may reasonably conclude that she is disabled, as both the SSA and Paul Revere Life Insurance Company did, our standard of review in this matter is

deferential, and we cannot say that Standard's determination was unreasonable.

## III.  CONCLUSION

Accordingly, we AFFIRM the decision of the district court.