In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2314

CATHLEEN KENNEDY,

*Plaintiff-Appellee,*

*v.*

THE LILLY EXTENDED DISABILITY PLAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-cv-01103-WTL-TAB — **William T. Lawrence**, *Judge.*

ARGUED MARCH 30, 2017 — DECIDED MAY 18, 2017

Before POSNER, MANION, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* This case is about fibromyalgia, "a common and chronic disorder characterized by widespread pain, diffuse tenderness, and a number of other symptoms. The word 'fibromyalgia' comes from the Latin term for fibrous tissue (*fibro*) and the Greek [terms] for muscle (*myo*) and pain (*algia*). … [F]ibromyalgia can cause significant pain and fatigue, and it can interfere with a person's ability to carry on daily activities. … Scientists estimate that fibrom-

yalgia affects 5 million Americans age 18 or older." National Institute of Arthritis and Musculoskeletal and Skin Diseases, "Questions and Answers about Fibromyalgia," July 2014, www.niams.nih.gov/Health_Info/Fibromyalgia/default.asp (visited May 16, 2017, as were the other websites cited in this opinion). "'Chronic' means that the pain lasts a long time— at least 3 months or longer. Many people experience fibrom-yalgia pain for years before being diagnosed. 'Widespread' means that it is felt all over, in both the upper and lower parts of the body. However, many people with fibromyalgia feel their pain in specific areas of their body, such as in their shoulder or neck. And 'Tenderness' means that even a small amount of pressure can cause a lot of pain." *Lyrica*, "Fibrom-yalgia [Frequently Asked Questions]," www.lyrica.com/ frequently-asked-questions#fibromyalgia.

As further explained by the Mayo Clinic, "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood is-sues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals. Symptoms sometimes begin after a physical trauma, surgery, infection or significant psychological stress. In other cases, symptoms gradually accumulate over time with no single triggering event. *Women are much more likely to develop fibromyalgia than are men.* Many people who have fibromyal-gia also have tension headaches, temporomandibular joint (TMJ) disorders, irritable bowel syndrome, anxiety and de-pression." Mayo Clinic, "Fibromyalgia," www.mayoclinic. org/diseases-conditions/fibromyalgia/home/ovc-20317786 (emphasis added).

There used to be considerable skepticism that fibromyalgia was a real disease. No more. See, besides the websites already cited, Anne Underwood, "The Long Search for Fibromyalgia Support," *New York Times*, Sept. 23, 2009, www.nytimes.com/ref/health/healthguide/esn-fibromyalgia-ess.html; and Valencia Higuera, "Fibromyalgia: Real or Imagined?," *Healthline Newsletter*, Aug. 17, 2016, www.healthline.com/health/fibromyalgia-real-or-imagined.

And finally the American College of Rheumatology offers the following harrowing description of the disease: "Fibromyalgia is a neurologic chronic health condition that causes pain all over the body and other symptoms. Other symptoms of fibromyalgia that patients most often have are: Tenderness to touch or pressure affecting muscles and sometimes joints or even the skin. Severe fatigue. Sleep problems (waking up unrefreshed). Problems with memory or thinking clearly. Some patients also may have: Depression or anxiety. Migraine or tension headaches. Digestive problems: irritable bowel syndrome (commonly called IBS) or gastroesophageal reflux disease (often referred to as GERD). Irritable or overactive bladder. Pelvic pain. Temporomandibular disorder—often called TMJ (a set of symptoms including face or jaw pain, jaw clicking, and ringing in the ears)." American College of Rheumatology, "Fibromyalgia," www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Fibromyalgia.

Eli Lilly and Company is a global pharmaceutical corporation headquartered in Indianapolis. And it is familiar with fibromyalgia because it markets a drug called Cymbalta (a trade name for Duloxetine) for treating the disease. It has retained an expert on fibromyalgia, Dr. Daniel Clauw of the

University of Michigan, a physician and professor of rheumatology, to advise it on the disease, and he has pointed out that many persons afflicted with fibromyalgia "end up needing to stop working because of this condition" and that the disease "is not only very common but is typically also very disabling."

So much for background; now for the case:

Cathleen Kennedy, the plaintiff, was hired by Lilly in 1982 and rose rapidly, eventually becoming an executive director in the company's human resources division, with a monthly salary of $25,011. But at the beginning of 2008 she was forced to quit work because of disabling symptoms of fibromyalgia. As a participant in the company's Extended Disability Benefits plan, she requested benefits upon ceasing to work, and effective May 1, 2009, was approved for monthly benefits of $18,972.44. Three and a half years later, however, her benefits were terminated, precipitating this suit by her against Lilly's self-funded Extended Disability Plan based on the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*, which so far as pertains to this case sets minimum standards for voluntarily established health and pension plans in private industry. See *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 115 (2008). Lilly's disability plan has discretion to deny claims that it deems not to meet its standard, but a reviewing court will overturn a denial of benefits if the plan's decision is unreasonable. *Edwards v. Briggs & Stratton Retirement Plan*, 639 F.3d 355, 360 (7th Cir. 2011).

The plan states that an employee has a "disability" if unable "to engage, for remuneration or profit, in any occupation commensurate with the Employee's education, training,

and experience." Kennedy's benefits were revoked by Lilly's Employee Benefits Committee (the administrator of the plan), on the ground that her fibromyalgia was not disabling.

The district judge granted summary judgment in favor of Ms. Kennedy and awarded her $537,843.81 in past benefits (benefits she should have received but did not) and pre-judgment interest, and in addition the judge ordered Lilly to reinstate Kennedy's disability benefits retroactive to December 2012 and resume the payment of her monthly benefits. Lilly based its unsuccessful case in the district court on evidence presented by a number of doctors (oddly not including Dr. Clauw), but the evidence turned out to be a hodge-podge. For example, Lilly sent Kennedy to be examined by a Dr. Schriber in Dayton, Ohio, more than 100 miles from Kennedy's home in Indianapolis. The doctor conducted a physical exam of her that lasted all of five minutes. He testified that the "American College of Rheumatology does not consider fibromyalgia to be disabling on a long-term basis." That, as we know from our earlier quotation from the ACR is false; and Lilly itself appears not to have relied on Dr. Schriber's opinion in its decision to terminate Kennedy's benefits.

A psychiatrist named Dr. Osman advised Lilly that Kennedy "from a psychiatric standpoint … has no restrictions or limitations," but based this on her having been diagnosed with Major Depressive Disorder and Anxiety Disorder rather than with fibromyalgia, a disease about which as a psychiatrist he could not be expected to offer an authoritative opinion; apparently he offered *no* opinion. Another psychiatrist, Dr. Goldman, opined similarly. And a urologist, Dr.

Davi, after reviewing Kennedy's medical records, told Lilly that she was not disabled from working "from a urology perspective," which Kennedy does not dispute and in any event seems irrelevant.

Kennedy's general internist, Dr. Condit, testified that she's permanently disabled, basing this opinion on his diagnoses of her nonarticular rheumatism (musculoskeletal aches and pains not traceable to joints), fibromyalgia, sleep disorder, depression, irritable bowel syndrome, restless leg syndrome, and her symptoms of pain and fatigue.

Dr. Condit retired and Dr. Steven Neucks became Kennedy's treating rheumatologist. He testified to her "pain, poor quality sleep, fatigue, and difficulty concentrating," remarked that "because of her fibromyalgia and degenerative arthritis, as well as her underlying discomfort, I do not think that she can work a regular work schedule," and added that he "thought [that] at [her] last visit [to him] her function level had declined slightly and that her anxiety was significantly worse." And he commended her for her "consistency and lack of attempt to over dramatize her limitations," adding that "is I believe, suggestive of forthright presentation."

Dr. Dayton Payne, reviewing Ms. Kennedy's disability claim but not examining her, opined that she was able to return to her past job, while acknowledging mention in the medical record of fatigue, irritable bowel, interstitial cystitis, depression, anxiety, attention deficit disorder, diffuse tenderness, and tender points. Dr. Payne appears not to have credited these symptoms, saying that "all of the laboratory data in this file are normal." But as the district judge pointed out, it is error to demand laboratory data to credit the symp-

toms of fibromyalgia—the crucial symptoms, pain and fatigue, won't appear on laboratory tests. *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003).

Another doctor hired by the company, Dr. Dikranian, a rheumatologist, reviewed Kennedy's medical records and expressed skepticism about whether she had fibromyalgia at all. But as with Dr. Schriber even Lilly seems not to have credited Dr. Dikranian's evaluation. The company's Employee Benefits Committee didn't mention his conclusions in its decision, and is represented by Lilly as having grudgingly "acknowledged that Kennedy does have fibromyalgia and that fibromyalgia has caused her "*some* restrictions and limitations" (emphasis added).

All deficiencies in its evidence to one side, Lilly has failed to indicate what job or kind of job, and at what level, Kennedy would be capable of performing if the company is permitted to cancel her benefits. Dr. Neucks opined that Kennedy "could do [only] a low stress, non-high cognitive functioning job at about 30 hours a week," which equals six hours a day. Neucks further opined that she would experience "flares" that would prevent her from working for one or two days a month, further shrinking her job prospects and presumably her salary. "Fibromyalgia is … characterized by chronic, widespread pain, fatigue, cognitive impairments, poor sleep, and mood difficulties. … These symptoms … appear to undergo periods of exacerbation or worsening, often colloquially referred to as 'flares' by patients and their health care providers." Ann Vincent *et al.*, "Fibromyalgia Flares: A Qualitative Analysis," 17 *Pain Medicine* 463 (2016),

http://academic.oup.com/painmedicine/article-lookup/doi/
10.1111/pme.12676.

Ms. Kennedy was informed by a liaison to the Employee
Benefits Committee that if she could work 20 hours per week
as a secretary she would not be considered disabled. Yet in
its written decision the Committee said only that Kennedy
could work in "various non-executive positions in compen-
sation, benefits, and other human resources fields," which is
both vague and inconsistent with the medical evidence. If
Dr. Neucks is correct about the flares (and there is no evi-
dence that he's not), Kennedy wouldn't be able to work any
regular schedule. Another questionable aspect of Lilly's case
is the company's conflict of interest, by reason of its being
both the initial adjudicator of an employee's benefits claim
(via Lilly's Employee Benefits Committee) and the payor of
those benefits. See *Metropolitan Life Insurance Co. v. Glenn*,
*supra*, 554 U.S. at 108. By cutting off Kennedy's benefits the
company has saved itself about $2.5 million. Big as Lilly is,
that's not a trivial loss.

The judgment of the district court is

AFFIRMED.

MANION, *Circuit Judge*, dissenting. Cathleen Kennedy challenges her plan administrator's decision to terminate her benefits under an ERISA disability plan. Under the plan, Kennedy is entitled to benefits if she is unable to perform "any occupation consistent with [her] education, training, and experience" because of illness or injury treated by a physician. The plan contains discretionary language, meaning we can overturn the administrator's decision only if it was arbitrary and capricious. *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007). Nevertheless, the court sets it aside. Because I conclude that the administrator's decision was within the bounds of reasonableness, I would sustain it. Therefore, I respectfully dissent.

Where ERISA disability plans contain language granting the plan administrator discretionary authority, our power to set aside the administrator's decision is substantially limited. We may "overturn the administrator's decision only where there is an absence of reasoning to support it." *Jackman Financial Corp. v. Humana Ins. Co.*, 641 F.3d 860, 864 (7th Cir. 2011). We are not to substitute our judgment for that of the administrator so long as the administrator has made "an informed judgment and articulate[d] an explanation for it that is satisfactory in light of the relevant facts." *Herman v. Cent. States, Se. & Sw. Areas Pension Fund*, 423 F.3d 684, 692 (7th Cir. 2005) (quoting *Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999)). In other words, the decision must stand unless it is "downright unreasonable." *Id.* (quoting *Carr*, 195 F.3d at 294). This is not a rubber stamp, but it is quite deferential. See *id.* at 693.

The administrator's decision in this case contains sufficient evidence to sustain it under that standard. With respect

to limitations caused by fibromyalgia (the main dispute here), the administrator relied on reports from Drs. Neucks and Condit, both of whom were Kennedy's treating rheumatologist at one point, as well as a record review by Dr. Payne. In 2010, Dr. Neucks concluded that Kennedy had "average fibromyalgia," with relatively high functioning and normal movement. He said that Kennedy could work a lower-stress job for about 30 hours per week with some limitations, but that her condition did not preclude the performance of any job. In 2012, once Dr. Neucks had replaced Dr. Condit as treating rheumatologist, he indicated once again that Kennedy could not perform her old job because of its high stress and cognitive demands. In 2013, he opined that Kennedy could not work a regular schedule or perform high-stress activities. He never stated that Kennedy was totally disabled from doing any work.[1]

After a record review, Dr. Payne concluded that Kennedy's medical records did not support restrictions or limitations on

---

[1] The court thinks that the "any occupation" standard is too harsh. It finds unfair that Kennedy might have to take a part-time position or a job below her pay grade and forego disability benefits (which she, quite rationally, probably doesn't want to do given the significant sum she receives in benefits each month). But it's not our place to rewrite the language of the plan, and the administrator has discretion to interpret it.

Moreover, the court faults the administrator for its failure to indicate which jobs Kennedy could do with her restrictions. Of course, the administrator did say that she could potentially do "various non-executive positions in compensation, benefits, and other human resources fields." The court says this is both vague and inconsistent with the medical evidence. However, as I explain throughout the dissent, the conclusion that Kennedy could perform in a lower-stress position (with some accommodations for flare-ups) is a reasonable interpretation of the evidence.

activities. The court says that Dr. Payne erred by requiring laboratory data to confirm Kennedy's diagnosis of fibromyalgia, but that's not quite right. He acknowledged the diagnosis, but his relevant conclusion was about Kennedy's functional limitations. While the amount of pain someone experiences is entirely subjective, "how much an individual's degree of pain or fatigue limits [her] functional abilities ... can be objectively measured." *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007); see also *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 17 n.5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."). Social Security administrative law judges make these determinations every day in cases where claimants report pain but can still do some work. In short, it was not improper for the administrator to rely on Dr. Payne's conclusion that Kennedy's medical records did not support functional limitations, irrespective of the diagnosis of fibromyalgia.

There was also other evidence apart from the doctors that indicated Kennedy could work in some occupations. She self-reported in a questionnaire to Anthem that she exercised often (and Dr. Neucks reported in 2010 that Kennedy could jog three miles). And, speaking of Social Security, that Administration found that Kennedy was not disabled under a similar standard to "any occupation" on February 13, 2012. We have upheld an administrator's decision to *deny* benefits in several cases despite a contrary Social Security decision, so the administrator in this case should have been entitled to rely in part on a *negative* Social Security finding. See, e.g., *Mote*, 502 F.3d at 610; *Black v. Long Term Disability Ins.*, 582 F.3d 738, 748

(7th Cir. 2009). That is especially true when the Social Security decision bolsters other competent evidence on the record.[2]

Nobody disputes that Kennedy has fibromyalgia. Yet, most people with fibromyalgia can work. *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003). I cannot agree that the administrator's determination that Kennedy is one of those still able to work was arbitrary and capricious. "Although others reviewing [Kennedy's] medical condition in the first instance may reasonably conclude that she is disabled … our standard of review in this matter is deferential, and we [should not] say that [the administrator's] determination was unreasonable." *Black*, 582 F.3d at 748. The record contains sufficient evidence to uphold the decision. Therefore, I would reverse the judgment of the district court.

I respectfully dissent.

---

[2] The court also references the administrator's conflict of interest. We have held that conflicts of interest for self-funded ERISA plans "may act as a tiebreaker in finding that the determination was arbitrary and capricious" depending on the circumstances of the case. *Black*, 582 F.3d at 748 (citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008)). But in *Black*, we rejected the employee's argument that a conflict of interest required the administrator to give more weight to a positive Social Security determination. *Id.* Here, we have a negative Social Security finding and other evidence by which the administrator could have rationally found that Kennedy is not disabled. The self-funded nature of the plan does not override that deferential standard of review.