In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-2269

DONALD ARTZ,

*Plaintiff-Appellant,*

*v.*

HARTFORD LIFE & ACCIDENT INSURANCE COMPANY,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:21-cv-00391-BHL — **Brett H. Ludwig**, *Judge.*

———————————

ARGUED FEBRUARY 23, 2024 — DECIDED MAY 6, 2024

———————————

Before SCUDDER, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Donald Artz worked as an electric distribution controller at WEC Energy Group until his multiple sclerosis caused him to retire. He sought long-term disability benefits from WEC under a plan administered by Hartford Life and Accident Insurance Company. Concluding that Artz was not "disabled" within the meaning of the plan, Hartford denied his claim. Artz then filed suit under the Employee

Retirement Income Security Act, alleging that the disability
determination was arbitrary and capricious because Hartford
misconstrued the terms of the plan and failed to provide a
reasonable explanation for its decision.

While Hartford's denial letters were not models of thor-
oughness, we conclude that the plan administrator communi-
cated rational reasons for its decision based upon a fair read-
ing of the plan and Artz's medical records—and provided
sufficient process besides. Because ERISA requires no more,
we affirm.

## I

## A

Donald Artz began working at WEC Energy Group, an
electric utility company in Milwaukee, Wisconsin, in 1998.
For most of his career he worked as a Senior Electric Distribu-
tion Controller, a position WEC described as an "[a]dminis-
trative or clerical occupation in which the employee is primar-
ily involved with sedentary work," under conditions "gener-
ally associated with working in an office environment." The
position required Artz to work rotating 12-hour shifts—one
week on the day shift, one week on the night shift. Artz
learned that he had multiple sclerosis in 2003 but managed to
continue in his role at WEC for sixteen more years. He finally
stopped working in November 2019 due to worsening fa-
tigue—a well-known symptom of MS.

In early 2020 Artz asked WEC to accommodate a reduc-
tion in shift length from twelve to eight hours due to his fa-
tigue, but the company denied the request. Artz received
short-term disability benefits under WEC's plan beginning in
January 2020 (approved by the administrator, Hartford, and

paid out by WEC), and the Social Security Administration eventually awarded disability benefits in April 2020. When Artz applied for long-term benefits under WEC's disability plan, however, Hartford denied the request in January 2021.

Under the terms of WEC's long-term disability benefits plan—governed by the Employee Retirement Income Security Act of 1974—Hartford as the plan administrator has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions." The plan defines "Disability or Disabled" as being "prevented from performing one or more of the Essential Duties" of "Your Occupation." The plan in turn defines "Essential Duty" as

> 1) [] substantial, not incidental; 2) [] fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed. Your ability to work the number of hours in Your regularly scheduled workweek is an Essential Duty.

From there the plan states that "Your Occupation" is defined "as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location."

Hartford reviewed Artz's medical history but found conflicting information about his ongoing ability to work in his field. His treating neurologist, Dr. Bhupendra Khatri, opined in October 2019 (and several times thereafter) that Artz could work 8 hours per day, 40 hours per week despite having MS, whereas occupational therapist Jodi Kitzrow capped Artz's work capacity at 4 hours per day, 20 hours per week. A third professional, Dr. Al Baltrusaitis, an occupational medicine

physician, was even less optimistic and determined that Artz was altogether "not capable of gainful employment." Dr. Baltrusaitis based his view on the disability standards in the Social Security Administration's Handbook for Physicians. But he later amended his opinion to state that Artz could handle working 4 hours per day, 20 hours per week.

To resolve these inconsistent opinions, Hartford retained a third-party contractor to provide an independent medical assessment. Neurologist Sherry Leitch reviewed Artz's medical records and spoke with Dr. Baltrusaitis before concluding that Artz could work 8 hours per day, 40 hours per week. Dr. Leitch's notes indicate that Dr. Baltrusaitis had informed her that Artz struggled with dexterity and endurance after 8 hours. Her notes also reflected her own opinion that "the evidence does not substantiate severe cognitive abnormalities." While Artz's cognitive function would be affected by fatigue, Dr. Leitch believed he could work up to 8 hours per day. Dr. Leitch later clarified that Artz's workday should be confined to the hours of 6:30 a.m. and 4:30 p.m. She also recommended physical limitations that would allow Artz to avoid walking and standing for extended periods of time. Dr. Khatri, Artz's treating neurologist, later opined that he agreed with Dr. Leitch's conclusions.

Hartford's claim review process also entailed a case manager performing an "occupational analysis" to determine the "essential duties" of Artz's occupation in the general workplace as defined by the terms of WEC's long-term disability plan. The case manager consulted the U.S. Department of Labor's Dictionary of Occupational Titles, the Occupational Information Network, and the Occupational Access System database, and determined that Artz's position at WEC equated

to a "power-distribution engineer" in the general work-place—a "sedentary" job that might require "exert[ing] up to 10 pounds of force occasionally." The essential duties of the position, the case manager continued, included "planning construction" and "coordinating operation of facilities for transmitting power." The position did not require squatting, stooping, or walking on irregular surfaces, activities problematic for Artz due to his MS. The case manager's occupational analysis reached no conclusion on shift length, but a second Hartford representative later added a note to the claim file acknowledging that "12 hour day[s]" are "not essential to [Artz's occupation]."

Hartford's initial denial letter in June 2020 reiterated Dr. Leitch's conclusion that "from a cognitive perspective, there was no objective evidence to substantiate severe cognitive abnormalities." The broader medical record, Hartford explained, indicated that Artz could work 40 hours per week (over a standard 5-day work week). The letter then explained that although "your specific employer may require working shifts longer than 8 hours, that is not a requirement in the national economy, and not an Essential Duty of your Occupation." In the end, then, Hartford concluded that Artz was not "disabled" within the meaning of WEC's long-term disability plan.

Artz filed an administrative appeal in November 2020. Hartford responded by providing Artz with a copy of his claim file and informing him twice that he could submit additional information (to include his Social Security disability records) in support of his appeal. But Artz declined to submit anything further to Hartford.

During the administrative appeal, Hartford requested another round of independent assessments—again from a third-party reviewer—to take a fresh look at Artz's medical history. Neuropsychologist Michael Sugarman reviewed Artz's medical record and concluded that Artz, despite suffering from MS, could work standard 8-hour days. Dr. Sugarman explained that he saw "no objective documentation of reductions in [Artz's] 'ability to focus'" and declined to comment on the need for "fatigue"-based restrictions. Neurologist Stephen Selkirk also reviewed Artz's records and likewise opined that the "available evidence" did not support fatigue- or focus-based restrictions beyond the 8-hour workday. Dr. Selkirk saw no evidence to support cognitive dysfunction or attention deficits and concluded that "[t]he severity and frequency of [Artz's] reported symptoms are not corroborated by clinical data in the medical record."

Before making a final decision on Artz's claim, Hartford sent Dr. Selkirk's and Dr. Sugarman's reports to treating neurologist Dr. Khatri for his review and included a form for written comments. Dr. Khatri responded, "I do not agree with your decision," but provided no explanation for his view.

Hartford denied Artz's administrative appeal and upheld the denial of benefits in January 2021, explaining that "the totality of the evidence does not corroborate a severity in the symptoms such that functional impairment is established." Hartford acknowledged that it had considered Artz's receipt of Social Security disability benefits but explained that the terms of WEC's long-term disability plan differed from the federal Social Security disability standard in critical ways.

B

Artz sued both Hartford and WEC in state court, alleging that the denial of long-term benefits amounted to a breach of contract under Wisconsin law. Hartford removed the case to federal court, viewing the claim as completely preempted by § 1132(a)(1)(B) of the Employee Retirement Income Security Act. The doctrine of complete preemption, the Supreme Court has explained, creates an exception to the well-pleaded complaint rule that a court look only to the complaint to determine whether there is federal question jurisdiction under 28 U.S.C. § 1331. See *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004). "When a federal statute wholly displaces the state-law cause of action through complete pre-emption, the state claim can be removed" under 28 U.S.C. § 1441(a) because the claim "is in reality based on federal law." *Id.* at 207–08 (cleaned up).

Following removal to federal court, Artz filed an amended complaint against Hartford alone. Invoking § 1132(a)(1)(B) of ERISA, which provides a civil action "to recover benefits due to [the employee] under the terms of his plan," Artz alleged that he was entitled to recover long-term disability benefits under the terms of WEC's plan. The amended complaint dropped the state law claim.

The district court upheld the denial of benefits at summary judgment, concluding that Artz had placed too much emphasis on the duties of his specific position at WEC rather than the "essential duties" of his job in the general workplace as required by the company's plan. Going further, the district court underscored the independent medical reviews commissioned by Hartford and, after canvassing the opinions of the third-party physicians, saw the medical evidence as supporting only one conclusion—that Artz's MS did not prevent him

from working a standard 40-hour week as a power-distribution engineer. The decision to hire independent examiners, the district court continued, alleviated any "conflict of interest" based on Hartford's dual role in approving and paying out the long-term disability benefits, especially where Hartford provided Artz with "a review process, copies of the medical opinions, [and] opportunities to respond."

Finally, the district court rejected Artz's contention that the approval of other forms of disability benefits (in particular, Social Security benefits and short-term benefits under WEC's plan) required Hartford to approve long-term benefits, observing that Artz had declined to provide copies of his Social Security records and had not clearly identified the terms of WEC's short-term benefits plan.

Artz now appeals.

## II

ERISA requires an employee benefit plan (or here its claims administrator) to "set[] forth the specific reasons" for the denial of disability benefits. 29 U.S.C. § 1133(1). The Act also states that claimants must receive a "reasonable opportunity" for "a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). To that end, ERISA's implementing regulations require that the plan administrator describe in the initial denial letter "any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(1)(iii). That way, "when a claimant appeals a denial to the plan administrator, he will be able to address the determinative issues and have a fair chance to present his

case." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992).

The parties agree that WEC's long-term disability benefits plan grants Hartford as the plan administrator discretionary authority to determine benefits. "When the administrator has such discretionary authority, as the vast majority now do, the court applies a more deferential standard [of review], seeking to determine only whether the administrator's decision was arbitrary and capricious." *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (internal quotation marks omitted). The controlling questions under this standard of review incorporate the terms of § 1133: whether Hartford communicated "specific reasons" for the denial of benefits and whether Artz received an opportunity for "a full and fair review" of the decision. See *Majeski v. Metropolitan Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009). We also review more generally whether Hartford's decision finds rational support in the record. Our cases are clear that we will not overturn the denial of benefits "absent special circumstances such as fraud or bad faith." *Dragus v. Reliance Standard Life Ins. Co.*, 882 F.3d 667, 672 (7th Cir. 2018) (internal quotation marks omitted).

One final note about the standard of review. With Hartford as the plan administrator shouldering responsibility for both evaluating and paying Artz's claim, we must remain mindful of the possibility that this conflict of interest "affected the benefits decision." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 116–17 (2008). The substantive standard of review is still the same—the arbitrary-and-capricious standard—but "the conflict of interest is 'weighed as a factor in determining whether there is an abuse of discretion.'" *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir.

2009) (internal citation omitted); see also *Glenn*, 554 U.S. at 117 (suggesting that the conflict-of-interest factor may "act as a tiebreaker when the other factors are closely balanced").

## A

Because the terms of WEC's long-term disability plan determine eligibility for benefits, we begin there. And we do so underscoring that everyone recognizes that Artz has MS and has exhibited extraordinary strength struggling with its symptoms for years.

The question before us mirrors the one before the district court: whether Artz brought forth enough evidence at summary judgment to permit a finding that he meets the WEC plan's definition of "disabled" for purposes of receiving long-term disability benefits. Recall from the plan itself that Artz qualifies as "disabled" only if he cannot perform one or more "essential duties" of his occupation as it is "recognized in the general workplace."

The core disagreement between the parties relates to the "essential duties" of a power-distribution engineer. Hartford emphasizes that WEC's plan enumerates as one essential duty "[y]our ability to work the number of hours in Your regularly scheduled workweek." We agree with the district court's takeaway from the medical evidence and, more specifically, the opinions of the independent reviewers Hartford enlisted to assess Artz's ongoing ability to work as a power-distribution engineer. The medical record shows that Artz can still work a traditional week of 40 hours broken down into five eight-hour shifts. Artz's primary pushback is to contend that Hartford should have recognized that WEC called on its power-distribution engineers not to work ordinary eight-

hour days, but instead to work three 12-hour shifts each week. Artz sees the longer shifts—the 12-hour shifts—as defining an essential duty of his job at WEC and one that his MS no longer allows him to perform.

The fatal flaw in Artz's position is that an employer's specific requirements—here WEC's requirements for its power-distribution engineers—differ from the way the company's long-term disability benefits plan defines the "essential duties" of that position. In no uncertain terms, the plan states that essential duties are "substantial," "fundamental or inherent to the occupation," and "cannot be reasonably omitted or changed," and Artz has provided nothing aside from evidence of his own job requirements at WEC to show that 12-hour shifts (or nighttime shifts or overtime work) are inherent to the power-distribution engineer occupation.

Artz failed to provide any such evidence despite Hartford's clear statement in the initial denial letter that "working shifts longer than 8 hours" is "not an Essential Duty of your Occupation." We agree with Artz that Hartford's denial letter could have been more plain and precise—it could have explained, for example, that the Dictionary of Occupational Titles and other occupational sources say nothing at all about shift length for a power-distribution engineer. Still, Hartford said enough to survive arbitrary-and-capricious review. The initial denial letter allowed Artz to "formulate [a] further challenge" to Hartford's conclusion that shift length was not an essential duty, which is all that ERISA requires. See *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996) (explaining the purpose behind ERISA's requirement that the plan administrator state specific reasons for the denial of benefits); see also *Halpin*, 962 F.2d at 690 (framing as the relevant

question whether the beneficiary received "a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review").

The facts here do not align in Artz's favor—at least not enough for the question to go to a jury. He knew at least as early as his receipt of the initial denial letter that WEC did not consider 12-hour shift length an essential duty of his occupation. Yet he provided no evidence during the appellate process outside of his WEC job description to support his claim that shift length is in fact an essential duty.

B

Perhaps anticipating that conclusion, Artz pivots and argues that that even if his occupation as defined by the terms of WEC's plan requires only 8-hour shifts, his MS leaves him unable to dedicate the requisite attention and focus to his job as a power-distribution engineer for that amount of time. But here, too, we conclude that Artz's position falls short because Hartford, in denying long-term disability benefits, communicated rational reasons for its decision based on the available medical evidence. As Hartford explained in its denial letters, the medical record on balance shows that Artz can work a standard 8-hour shift as a power-distribution engineer without accompanying fatigue-based limitations.

While two of the medical professionals who conducted in-person physical exams (Dr. Baltrusaitis and Jodi Kitzrow) capped Artz's work capacity at 4 hours per day, Dr. Khatri also conducted an in-person physical exam and concluded that Artz could work 8-hour workdays between the hours of 6:30 a.m. and 4:30 p.m. And Hartford did not base its denial

solely on Dr. Khatri's opinion. Indeed, Hartford recognized that Dr. Khatri's 8-hour recommendation conflicted with the 4-hour recommendation and decided to investigate further. To that end, Harford sought an independent medical assessment to get to the bottom of Artz's functional work capacity.

Hartford's ultimate reliance on Dr. Leitch's independent assessment was reasonable. After reviewing Artz's medical records, and after speaking with Dr. Baltrusaitis (the occupational medicine physician), she concluded that Artz could still work a standard 40-hour week (with 8 hours per day) despite his fatigue- and focus-based MS symptoms. Dr. Leitch added that Artz should avoid standing and walking for extended periods of time, but those restrictions are not inconsistent with sedentary work. In these circumstances, Hartford reasonably relied on the treating neurologist and independent assessor's consensus view to deny Artz's claim for long-term disability benefits at the initial decision-making stage. See *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 578 (7th Cir. 2006) (characterizing decisions about conflicting medical evidence as "question[s] of judgment that should be left to [the administrator] under the arbitrary-and-capricious standard").

When Artz pursued an administrative appeal, Hartford again sought independent assessments. Two neurologists agreed with Drs. Khatri and Leitch that Artz could work 8 hours per day, 5 days per week. And, for their part, independent assessors Drs. Sugarman and Selkirk explained that Artz had not come forward with any objective evidence to substantiate the need for additional fatigue- or focus-based restrictions or other functional limitations. See *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007) (describing the distinction between "the amount of fatigue or pain an

individual experiences … [which] is entirely subjective," and "how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured").

Artz did not pursue follow-up testing even after receiving these independent assessments—and despite receiving notice in the initial denial letter that there was a lack of objective evidence surrounding his cognitive function. He nonetheless insists that this was not an evidentiary failure on his part, but instead that Hartford as the plan administrator should have ordered more objective tests. This strikes us as in tension with the plain import of ERISA's implementing regulations, though. See 29 C.F.R. § 2560.503-1(g)(iii) (stating that the claimant—not the administrator—"perfect[s] the claim"); see also *Halpin*, 962 F.2d at 691 (suggesting that once the ERISA plan informs the claimant that more information is needed, the claimant—not the administrator—must provide it).

We have stated our conclusion with caution because our decision in *Hennen v. Metropolitan Life Insurance Company* intimated that the administrator would have done well to order additional testing. But we offered that observation in very different circumstances. See 904 F.3d 532, 540–41 (7th Cir. 2018). In *Hennen*, no fewer than five doctors examined the claimant in person and found clinical evidence of an often-disabling condition called radiculopathy. *Id.* at 540. But a sixth doctor disagreed (without even being asked to opine on the diagnosis), suggesting that more tests were needed to find objective evidence of the condition. See *id.* at 538. Instead of ordering more tests or otherwise grappling with the fact that five doctors had reached a different conclusion, the plan administrator simply adopted the sixth doctor's conclusion and denied

benefits. *Id.* at 541. We explained in that specific situation, where "all [five of] the examining doctors disagreed with [the administrator's reviewing doctor] on the key issue," that the administrator acted arbitrarily in deciding to privilege its own doctor's findings—especially where that doctor made the "key final recommendation" to arrange for follow-up testing. *Id.* at 540–41.

The record here, by contrast, contained rational support for Hartford's decision to deny long-term benefits under WEC's plan even without additional testing. See *Davis*, 444 F.3d at 576–77 ("The judicial task here is not to determine if the administrator's decision is correct, but only if it is reasonable."). Treating neurologist Dr. Khatri concluded on multiple occasions that Artz could work 8 hours per day, 5 days per week despite his physical and cognitive MS symptoms. See *id.* at 577 (suggesting that it is reasonable for a plan administrator "to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations," especially where the administrator's doctors were not "completely at odds with the claimant's doctors and the medical evidence"). Dr. Khatri may have later changed his opinion about Artz's overall employability—but he did so without providing any explanation or evidentiary support. See *id.* at 578 (discounting a physician's change of opinion because it was made without "new data in the record").

C

We owe a few words in response to Artz's emphasis on how his receipt of Social Security disability benefits and short-term disability benefits under WEC's plan further shows the infirmity in Hartford's conclusion. To Artz's mind, those more favorable determinations prove once and for all that

Hartford's conflict of interest affected the long-term benefits decision. We cannot agree.

Remember that Artz declined to provide his Social Security records to Hartford even though he was invited to do so. See *Black v. Long Term Disability Ins.*, 582 F.3d 738, 748 (7th Cir. 2009) (observing that the insurer reasonably rejected the SSA's disability finding because "the SSA did not review the same information that [the administrator] obtained from its consulting physicians"). Even had Artz provided these records, the validity of his claim would turn, "in large part, on the interpretation of terms in the plan at issue." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003) (internal quotation marks omitted).

Nor did Hartford's approval of short-term disability benefits necessarily resolve the question of long-term benefits under the WEC plan. See *Holmstrom*, 615 F.3d at 767 (explaining that a plan administrator "is entitled to seek and consider new information and, in appropriate cases, to change its mind"). Prohibiting plan administrators from collecting new information during the long-term benefits review process (or requiring them to collect more information in the short term) would effectively require a merger of short- and long-term benefits determinations.

\* \* \*

In no way is the human side of our conclusion lost on us. Multiple sclerosis is a serious disease, and we have much sympathy for Artz's position. But this case is before us on arbitrary-and-capricious review, and as Hartford explained in its final denial letter, "the presence of a diagnosis or symptom alone does not represent functional impairment resulting in

Disability as defined by the Policy." The evidence must show, in addition to the *existence* of symptoms, that the "severity and persistency" of those symptoms results in "functional impairment"—especially for a "highly heterogeneous condition" like MS. That is where Artz's claim falls short. Several physicians concluded that he did not present enough objective evidence to show "severity and frequency" of symptoms "such that functional impairment [was] established." This evidentiary record leaves us no choice but to AFFIRM.