**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KANIKA SHAVON REVELS,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner Social Security,<br>*Defendant-Appellee.* | No. 15-16477<br><br>D.C. No.<br>2:14-cv-01623-<br>SRB<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted May 19, 2017
San Francisco, California

Filed October 26, 2017

Before:  Andrew J. Kleinfeld and Kim McLane Wardlaw,
Circuit Judges, and Cathy Ann Bencivengo,* District Judge.

Opinion by Judge Wardlaw;
Dissent by Judge Kleinfeld

---

*The Honorable Cathy Ann Bencivengo, United States District Judge for the Southern District of California, sitting by designation.

## SUMMARY[**]

### Social Security

The panel reversed the district court's order affirming the denial of supplemental security income and disability insurance benefits by the Commissioner of the Social Security Administration, and remanded with instructions to remand the case to the agency for the calculation and award of benefits.

The administrative law judge ("ALJ") found that claimant had three severe medical impairments – arthritis, obesity, and fibromyalgia – but determined that claimant could perform her past relevant work, and denied benefits.

In July 2012, the Social Security Administration issued Social Security Ruling ("SSR") 12-2P, a ruling that established that fibromyalgia may be a severe medical impairment for purposes of determining disability.

The panel held that in determining the intensity, persistence, and limiting effects of claimant's symptoms, the ALJ failed to provide legally sufficient reasons for rejecting the opinions of rheumatologist Dr. Nolan, physical therapist Richard Randall, and nurse practitioner Mager. The panel also held that the ALJ erred in rejecting claimant's symptom testimony and the lay opinions of her mother and father. The panel concluded that these errors arose from a fundamental misunderstanding of fibromyalgia.  The panel further held

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

that the ALJ failed to properly analyze claimant's fibromyalgia-related symptoms pursuant to SSR 12-2P, and the court's opinion in *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004).

Specifically, the panel held that the ALJ erred in giving Dr. Nolan's opinion no weight, and instead should have found it to be controlling as to the intensity, persistence, and limiting effects of claimant's fibromyalgia. The panel concluded that because the vocational expert testified that a claimant with the physical limitations outlined in Dr. Nolan's medical opinion would be unable to do any full-time work, Dr. Nolan's opinion by itself established that claimant was entitled to benefits.

The panel concluded that each of the "credit-as-true" factors, outlined in *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014), were satisfied, and that remand for the calculation and award of benefits was warranted.

Judge Kleinfeld dissented. Judge Kleinfeld would hold that the ALJ properly found that claimant was not wholly credible, and properly dismissed medical testimony supporting claimant's position. Judge Kleinfeld would conclude that claimant did not establish that the ALJ's conclusions were unsupported by substantial evidence, and he would affirm the ALJ's decision to deny benefits.

**COUNSEL**

Eric G. Slepian (argued), Phoenix, Arizona, for Plaintiff-Appellant.

Lars J. Nelson (argued), Special Assistant United States Attorney; David Morado, Regional Chief Counsel, Region X; Office of the General Counsel, Social Security Administration, Seattle, Washington;   for Defendant-Appellee.

**OPINION**

WARDLAW, Circuit Judge:

Kanika Revels ("Revels"), a now forty-one-year-old woman who suffers from fibromyalgia, and who last worked as a phlebotomist, appeals the district court's order affirming the denial of  supplemental security income and disability insurance benefits by the Commissioner of the Social Security Administration ("SSA").  In July 2012, the SSA issued Social Security Ruling ("SSR") 12-2P, a ruling that establishes that fibromyalgia may be a severe medical impairment for purposes of determining disability.   In addition, the SSA provided guidelines for the proper evaluation of the disease, echoing many of our statements about fibromyalgia in *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004).  The administrative law judge ("ALJ"), the SSA Appeals Council, and the district court failed to heed the instructions of those rulings, and instead analyzed her symptoms and rejected Revels' claim without considering the unique characteristics of fibromyalgia, the principal source of her disability.  We reverse the judgment below and instruct

the district court to remand the case to the agency for the calculation and award of benefits.

## I.

Revels applied for supplemental security income and disability insurance benefits on February 2, 2011, claiming a disability onset date of January 20, 2011. On February 9, 2011, the agency denied Revels' application for supplemental security income because her income rendered her ineligible. Finding her not disabled, the agency denied her application for disability insurance benefits on June 29, 2011. On reconsideration on November 23, 2011, the agency again rejected both claims, relying only on the finding that Revels was not disabled. Revels requested a hearing before an ALJ, which was held on October 1, 2012. At the hearing, Revels provided updated medical records to support her claimed impairments. In addition, both Revels and a vocational expert testified.

On October 26, 2012, the ALJ concluded that Revels was not disabled and denied her claims. The ALJ followed the five-step sequential evaluation process for determining whether an individual is disabled. At step one, he found that Revels had not engaged in "substantial gainful activity" since January 20, 2011, her alleged disability onset date. At step two, he determined that she had the following severe impairments: arthritis, obesity, and fibromyalgia. He determined that her depression was nonsevere.[1] At step three, the ALJ determined that Revels did not have an impairment or combination of impairments that met or medically equaled

---

[1] Revels does not challenge this finding on appeal.

one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Before reaching step four, the ALJ determined Revels' residual functional capacity ("RFC"). He determined that she was mostly able to perform light work as defined in 20 C.F.R. § 404.1567(b). Light work entails lifting up to twenty pounds at a time, with frequent lifting or carrying of objects up to ten pounds. 20 C.F.R. § 404.1567(b). It also may include "a good deal of walking or standing," or "sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* The ALJ found that Revels had slight limitations on her ability to do light work. He found that she could only occasionally climb ladders, ropes, scaffolds, ramps, and stairs, and only occasionally stoop, crouch, kneel, and crawl. He determined that she could frequently balance and reach overhead bilaterally, and was capable of frequent handling, fingering, and feeling. He also found that she should avoid irritants such as fumes, odors, dust, and gases, and should avoid unprotected heights and the use of moving machinery, except motor vehicles.

In determining Revels' RFC, the ALJ found that Revels' impairments could reasonably be expected to cause the symptoms she alleged, but that her statements about the intensity, persistence, and limiting effects of her conditions were "not entirely credible to the extent they [we]re inconsistent with the . . . residual functional capacity assessment." He found her testimony to be inconsistent with the medical treatment notes and her descriptions of her daily activities. The ALJ also discredited Revels' testimony because of Revels' "inconsistent reporting of marijuana usage," and inconsistent descriptions of the effectiveness of her treatments. The ALJ assigned no weight to the opinions

of Revels' treating rheumatologist, Dr. Joseph Nolan, or her physical therapist, Richard Randall.  He gave "some weight" to the opinion of the state agency consultative examiner, Dr. Keith Cunningham, and assigned significant weight to the opinions of the two state agency nonexamining physicians, Dr. Alicia Blando and Dr. Debra Rowse.  He also assigned significant weight to Revels' hand doctor, Dr. Sebastian Ruggeri.

At step four, the ALJ determined that Revels' RFC allowed her to perform her past relevant work as a medical assistant and phlebotomist.  Accordingly, he denied benefits.

The Appeals Council denied Revels' request for review on May 20, 2014.  It considered additional evidence submitted by Revels' primary care provider, Jacqueline Mager, but determined that the evidence did not provide a basis for overturning the ALJ's decision.  Revels then filed a complaint in the United States District Court for the District of Arizona, seeking review of the agency's decision.  The district court affirmed the ALJ's decision on June 10, 2015.  Revels timely appealed.

## II.

### A.  *Standard of Review*.

We review de novo a district court's order affirming a denial of Social Security benefits by the Commissioner. *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015). We set aside a denial of Social Security benefits only when the ALJ decision is "based on legal error or not supported by substantial evidence in the record." *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003).  "Substantial

evidence means more than a mere scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citations omitted) (internal quotation marks omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation marks omitted). Yet we "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). "We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Id.* at 1010; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## B. Evaluation of Medical Source Opinions.

The medical opinion of a claimant's treating doctor is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2). When a treating doctor's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record.

*Id.* § 404.1527(c)(2)–(6). Greater weight is also given to the "opinion of a specialist about medical issues related to his or her area of specialty." 20 C.F.R. § 404.1527(c)(5). A doctor's specialty is especially relevant with respect to diseases that are "poorly understood" within the rest of the medical community. *Benecke*, 379 F.3d at 594 n.4.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). "When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" *Orn*, 495 F.3d at 632. Additionally, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating

physician." *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995) (emphasis in original).

In addition to considering the medical opinions of doctors, an ALJ must consider the opinions of medical providers who are not within the definition of "acceptable medical sources." *See* 20 C.F.R. § 404.1527(b), (f); SSR 06-3P.  While those providers' opinions are not entitled to the same deference, an ALJ may give less deference to "other sources" only if the ALJ gives reasons germane to each witness for doing so. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).  The same factors used to evaluate the opinions of medical providers who are acceptable medical sources are used to evaluate the opinions of those who are not. *Id.* § 404.1527(f); SSR 06-3P.  Those factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the doctor. *Id.* § 404.1527(c)(2)–(6). Under certain circumstances, the opinion of a treating provider who is not an acceptable medical source may be given greater weight than the opinion of a treating provider who is—for example, when the provider "has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole." *Id.* § 404.1527(f)(1).

## C.  *Evaluation of a Claimant's Testimony and Third-Party Reports.*

We have established a two-step analysis for determining the extent to which a claimant's report of her symptoms must be credited:

First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. In this analysis, the claimant is *not* required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom. Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof.

If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases.

*Garrison*, 759 F.3d at 1014–15 (citations omitted) (internal quotation marks omitted). To reject third-party reports of a claimant's impairments, the standard is much lower: an ALJ need only "give reasons that are germane to each witness." *Molina*, 674 F.3d at 1114 (quoting *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)); *see also* 20 C.F.R. § 404.1529(c)(3).

**III.**

The ALJ found that Revels had three severe medical impairments: arthritis, obesity, and fibromyalgia. However, the medical records largely pertain to Revels' fibromyalgia, as do the assessments concerning her limited functional ability. Because this case turns on whether the ALJ properly found Revels not disabled based on his conclusions about her fibromyalgia-related limitations, it is helpful to understand what fibromyalgia is, how it is properly diagnosed, and what its symptoms are.

Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke*, 379 F.3d at 589. Typical symptoms include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue." *Id.* at 590. What is unusual about the disease is that those suffering from it have "muscle strength, sensory functions, and reflexes [that] are normal." *Rollins v. Massanari*, 261 F.3d 853, 863 (9th Cir. 2001) (Ferguson, J., dissenting) (quoting Muhammad B. Yunus, *Fibromyalgia Syndrome: Blueprint for a Reliable Diagnosis*, Consultant, June 1996, at 1260). "Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling." *Id.* (quoting Yunus, *supra*, at 1260). Indeed, "[t]here is an absence of symptoms that a lay person may ordinarily associate with joint and muscle pain." *Id.* The condition is diagnosed "entirely on the basis of the patients' reports of pain and other symptoms." *Benecke*, 379 F.3d at 590. "[T]here are no laboratory tests to confirm the diagnosis." *Id.*

For a long time, fibromyalgia was "poorly understood within much of the medical community." *Id.* Indeed, "[t]here used to be considerable skepticism that fibromyalgia was a real disease." *Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136, 1137 (7th Cir. 2017). In previous decisions, we were reluctant to recognize fibromyalgia as an impairment that could render one disabled for Social Security purposes. *See Rollins*, 261 F.3d at 857 ("Assuming, without deciding, that fibromyalgia does constitute a qualifying 'severe impairment' under the Act . . . .").

A sea-change occurred in 2012, when the SSA issued a ruling recognizing fibromyalgia as a valid "basis for a finding of disability."[2] Social Security Ruling ("SSR") 12-2P, at *2. The ruling provides two sets of criteria for diagnosing the condition, based on the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia and the 2010 American College of Rheumatology Preliminary Diagnostic Criteria. *Id.* Pursuant to the first set of criteria, a person suffers from fibromyalgia if: (1) she has widespread pain that has lasted at least three months (although the pain may "fluctuate in intensity and may not always be present"); (2) she has tenderness in at least eleven of eighteen specified points on her body; and (3) there is evidence that other disorders are not accounting for the pain. *Id.* at *2–3. Pursuant to the second set of criteria, a person suffers from fibromyalgia if: (1) she has widespread pain that

---

[2] Though Social Security Rulings do not have the force of law, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations." *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989). Therefore, "we defer to Social Security Rulings unless they are plainly erroneous or inconsistent with the [Social Security] Act or regulations." *Id.*

has lasted at least three months (although the pain may "fluctuate in intensity and may not always be present"); (2) she has experienced repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, "especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome"; and (3) there is evidence that other disorders are not accounting for the pain. *Id.* at *3.

Therefore, diagnosis of fibromyalgia does not rely on X-rays or MRIs. Further, SSR 12-2P recognizes that the symptoms of fibromyalgia "wax and wane," and that a person may have "bad days and good days." SSR 12-2P, at *6. In light of this, the ruling warns that after a claimant has established a diagnosis of fibromyalgia, an analysis of her RFC should consider "a longitudinal record whenever possible." *Id.*

## IV.

### A.  *Personal and Medical Records.*

The administrative record provides a comprehensive account of Revels' impairments and functional limitations. Starting around 2000, Revels began to develop neck and upper back pain. Because of her pain, as well as her asthma, she obtained a disability placard in 2003. Around 2010, the pain in her neck and back increased markedly, and she also began to experience pain in her hands and feet. Revels visited the emergency room for pain twice in 2010, and three times in 2011. At least one of the visits was prompted by a fall caused by the pain and medication. Revels also

underwent treatment with a variety of doctors because of the pain she suffered.

    1.   Treating providers.

    Revels' primary care provider, nurse practitioner Jacqueline Mager,[3] saw her for at least ten appointments between 2010 and 2012 . During nine of those appointments, Revels sought treatment for chronic pain she was experiencing in her neck, back, feet, and hands. Mager referred Revels to several specialists: Dr. Doust, a pain-management specialist; Dr. Nolan, a rheumatologist; and Dr. Ruggeri, a hand specialist. In addition to her own evaluations of Revels, Mager received reports from the other doctors. On March 6, 2012, Mager completed a check-the-box assessment of Revels' ability to perform work-related physical activities. Mager indicated that, in an eight-hour workday, Revels could sit less than two hours, stand or walk less than two hours, lift less than twenty pounds, and carry less than fifteen pounds. She also opined that Revels could only occasionally use her hands and feet, and could only occasionally bend, crawl, climb, reach, stoop, balance, crouch, or kneel. The form was co-signed by a doctor in Mager's clinic, Dr. Richard Wolfson.

    Dr. Doust, a pain-management specialist, first saw Revels on June 17, 2010. He treated her for the pain she was experiencing throughout her body, and saw her at least ten

---

    [3] We may consider as part of the record on review the medical records from Mager that were submitted to the Appeals Council. *See Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012) ("[W]e have routinely considered evidence submitted for the first time to the Appeals Council to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence.").

times in 2010 and 2011. During her visits with Dr. Doust, Revels consistently described her pain as moderate or severe, ranging from seven to ten on a ten-point scale, and repeatedly explained that her pain significantly interfered with her daily activities. Dr. Doust ordered MRIs of Revels' spine, which revealed a bulging disc in her back and degenerative facets in her neck. On multiple visits, he also noted that she had a positive straight-leg raise test, which indicates a lower-back issue such as a herniated disc. Dr. Doust diagnosed Revels with fibromyalgia, cervical and lumbosacral degeneration, unspecified muscle pain and inflammation, cervical and lumbar nerve compression, and nerve inflammation. To alleviate her pain, he prescribed various pain relievers and muscle relaxants: Valium, Flector, Soma, Vicodin, and Percocet. In addition, he administered facet injections into her neck and epidural steroid injections into her back.

Dr. Nolan, a rheumatologist, began treating Revels for chronic pain on September 23, 2010. He saw her at least twelve times between 2010 and 2012. Dr. Nolan found that Revels' joints were normal with no synovitis, and that there were no limitations in her range of motion. However, during the first appointment, he noted that Revels' "history is quite characteristic of fibromyalgia," and throughout his treatment, he consistently found that she had "tenderness to palpation in the typical fibromyalgic tender points." Dr. Nolan administered eight tender-point examinations of Revels during his treatment. During five of the eight examinations, she had more than eleven out of eighteen tender points. Based on those results, Dr. Nolan concluded that Revels met the American College of Rheumatology's 1990 diagnostic criteria for fibromyalgia. To treat this condition, Dr. Nolan prescribed Neurontin, Robaxin, Trazodone, Lyrica, Soma, and Vicodin. To treat fibromyalgia flare-ups in Revels'

hands and wrists, Dr. Nolan administered several steroid injections. He concluded that her pain would not respond to surgical treatment.

On September 27, 2011, Dr. Nolan completed a check-the-box assessment of Revels' functional capacity. He reported the following: Revels could sit for forty minutes at a time, for a total of three hours per day; stand for one hour at a time, for a total of three hours per day; and walk for twenty minutes at a time, for a total of two hours per day. He also indicated that she needed to recline for at least one hour per day and alternate between sitting and standing positions every forty minutes, and also required a ten-minute break every sixty minutes. He reported that she could very seldomly lift and carry up to ten pounds or climb stairs, bend, stoop, crouch, kneel, or crawl. He noted that she could not repetitively grasp, push, pull, or do fine manipulations with her hands. If Revels was employed, Dr. Nolan estimated she would miss work at least seventy-five percent of the time. On September 10, 2012, he filled out another report with similar findings. Dr. Nolan also completed five insurance forms in 2011 and 2012 certifying that Revels could not work.

Dr. Ruggeri, a hand specialist, began treating Revels on February 8, 2011, after she experienced increased pain and weakness in her hands and wrists. Dr. Ruggeri saw Revels five times over a five-month period in 2011. In addition to visually examining her hands, Dr. Ruggeri ordered X-rays, a nerve conduction and velocity study, and an ultrasound. In his treatment notes, he wrote that she had "normal appearing hands" and "normal bony anatomy," and he concluded that she had "bilateral median neuritis." To treat the condition, he recommended vitamin B6, warm soaks and stretching, and physical therapy. He also prescribed methylprednisone to

reduce inflammation and "encouraged [her] to go back to some gainful work." Though he noted that she was being treated for fibromyalgia, he did not offer an opinion on whether her hand pain was related to the condition.

Revels saw a number of other providers on a more limited basis. Dr. William Stevens, a specialist in spinal issues, examined her in August and September of 2011. Reviewing MRIs and X-rays of Revels' spine, he determined that she had disc protrusion, stenosis, and radiculopathy. He recommended physical therapy but did not believe that surgery would resolve her pain. Dr. Glen Bair, an orthopedist, treated Revels twice in 2011 for pain in her left foot following an incident where she "stepped down wrong." He determined that X-rays of her feet appeared normal and recommended stretching. Revels also went to physical therapy.

2.  Examining providers.

Dr. Keith Cunningham examined Revels once, on March 9, 2011, for the Arizona Department of Economic Security. In his report, he recorded Revels' complaints of spinal pain. He wrote that, during the examination, Revels could "squat and stand," and could "walk, turn, and face [him] with a normal gait." He also recorded that she could "stand on each leg independently." He did not state whether she could do these activities once or multiple times, or whether she could do them for any prolonged period of time. However, he did note that she walked "to and from the exam room slowly." He found that both her coordination and range of motion were "normal," and that a straight-leg raise test was negative. Based on these findings, he concluded that she had "[c]hronic back pain with preserved range of motion" and

"[f]ibromyalgia without typical trigger points on today's exam." On a four-page form entitled "Medical Source Statement of Ability to Do Work-Related Activities," Dr. Cunningham responded only to the first question, indicating that Revels was not disabled. He did not respond to any of the follow-up questions, such as what her lifting, carrying, standing, and walking restrictions were.

Richard Randall, a physical therapist, examined Revels on August 18, 2011, to evaluate her ability to perform work-related physical activities. He prepared an eight-page report after conducting a three-and-a-half-hour examination and reviewing her medical records. He found that "she was unable to perform sitting position manipulative activities" for more than twenty-five minutes, and that she had "20 minutes of maximum standing tolerance." He also determined that she "would not be able to exert up to 10 lbs. of force occasionally and/or exert a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects including the human body." He concluded that these limitations rendered her unable to "maintain any sustained functional work position in order to function at a rate conducive to gainful employment." Randall also conducted various validity tests to determine whether the results were reliable, and found that Revels' reports of pain were accurate and that she was providing "full physical effort" during the exam.

3. Nonexamining physicians.

State agency physicians reviewed Revels' medical records at both the initial and reconsideration levels. At the initial level, Dr. Alicia Blando reviewed Revels' medical records. In her report, she relied on Dr. Cunningham's assessment that

Revels had fibromyalgia but did not show typical trigger points on the day of his exam, and also on the nerve conduction and velocity study ordered by Dr. Ruggeri that did not reveal abnormalities. She noted that Revels' complaints of hand pain were contradicted by her ability to write by hand, "at times, [in] small script," on one of her Social Security forms. She further noted that the medical records showed no atrophy, and that Revels was able to take care of five children and their daily needs. Dr. Blando assessed Revels' RFC: Revels could occasionally lift and/or carry twenty pounds, and frequently lift and/or carry ten pounds; she could stand and/or walk (with normal breaks) for six hours in an eight-hour workday; and she could sit (with normal breaks) for more than six hours in an eight-hour workday. She also found that there was no limit to Revels' ability to push and pull and that she could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. She found that Revels had no reaching, handling, fingering, or feeling limitations.

At the reconsideration level, Dr. Debra Rowse reviewed Revels' medical records and largely agreed with Dr. Blando's RFC assessment. She found that there was "no medical diagnosis for [Revels'] complaints of 'pain everywhere.'" She gave little weight to Dr. Nolan's opinion because his "exams do not meet the American College of Rheumatology's or SSA's diagnostic criteria for fibromyalgia." Though her RFC assessment mostly matched Dr. Blando's, Dr. Rowse found that Revels could frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds.

4.  Self-reporting and third-party evidence.

In a function report dated March 14, 2011, Revels described her daily activities.  In response to the prompt "Describe what you do from the time you wake up until going to bed," she listed an array of activities: using the bathroom, brushing her teeth, washing her face, taking her children to school, washing dishes, doing laundry, sweeping, mopping, vacuuming, going to a doctor's appointment for herself or for one of her children, visiting her mother and father, cooking, shopping, getting gas, and feeding her dogs.  She repeated several times, however, that her ability to do those activities depended on how she felt and "what [her] health permit[ted]."  She explained that she would do as much as possible "until [she couldn't] do it anymore."  She "didn't finish" many of the tasks she started, and often had to "take a break."  As she put it, "I just do what I can in a day's work before I get tired and give up."

Throughout the function report, Revels reiterated the limitations on her daily activities.  She stated that she had difficulty dressing, bathing, caring for her hair, shaving, feeding herself, and using the toilet.  When she would prepare a complete meal, it took "all day" because she needed to take breaks.  She was sometimes forced to split up grocery shopping into two trips.  She had limited ability to squat, bend, stand, reach, kneel, sit, walk, or climb stairs, and also had difficulty holding things.  To assist with her pain, she wore a back brace daily, a leg brace two to three times a week, and a splint every night for her hands.  She stated that it took her four days to fill out the report.

Revels completed a second function report on September 28, 2011, in which she provided similar information.  In

addition to the above, she stated that she could not walk more than fifteen to twenty minutes without rest, and that her pain interfered with her ability to sleep. She also described a problem with burning herself while cooking because she would drop pots and pans. Revels' mother and father filled out function reports describing many of the same issues. Revels' father reported that he often went over to Revels' home to assist her with household chores.

*B. Revels' Testimony Before the ALJ.*

At the hearing before the ALJ, Revels testified that she had stopped working as a phlebotomist on January 21, 2011, because she was in "extreme pain." She had difficulty kneeling down to assist her patients and had to use the countertop to stabilize herself. She was concerned for her patients' safety. When asked where she experiences pain, Revels responded, "All over." She described her pain as "aching pains, sharp pains in [her] back, sharp pains in [her] wrist." She also described numbness in her leg. In addition, she explained that she had issues with her hands "clos[ing] up" and "lock[ing]" on her. She testified that she no longer had problems with her left foot, although it did get swollen at times. She rated her pain, on average, as a seven out of ten, noting that it could become worse at times. She stated that her pain felt like "somebody[] [was] driving . . . a screwdriver" into her.

Revels testified that she lived in a single-story home with her grandparents, three daughters (ages 13, 16, and 19), and three grandchildren (all younger than two years old). She explained that her pain was always present and limited her ability to do daily chores. She took her kids to school in the morning but then had difficulty completing tasks at home,

such as laundry, mopping, and vacuuming. When asked how long she could vacuum, she answered, "Maybe 10, 15 minutes tops." She testified that she could do chores for only twenty to thirty minutes before she needed to take a break, and that she needed to lie down every day, usually for about an hour on average. Though she previously had dogs, she had to give them up six months before the hearing. She also explained that she had problems driving and using her cell phone because of her hand pain. She could not assist with taking care of her grandchildren because she was not able to hold them. She testified that she could stand for twenty to thirty minutes and sit for thirty to forty-five minutes, and also testified that she could walk no more than one block and lift no more than ten pounds.

Revels explained that the hand injections she received from Dr. Nolan "t[ook] the edge off" and provided limited relief for a week. She relied on medication, however, because she could "only get so many shots." She explained that the medications do not completely take away the pain and that she was experiencing side effects, including sleepiness and dizziness. She sometimes fell, and once had to go to the emergency room after falling in the shower. She explained that physical therapy had made her symptoms worse, as did facet and epidural injections. She felt better when sleeping, although she constantly had to change positions.

## C. *Vocational Expert's Testimony Before the ALJ.*

The vocational expert ("VE") testified about the work capabilities of several hypothetical claimants. The ALJ first asked about a claimant who could do light exertional work with the following limitations: she could occasionally climb

ladders, ropes, and scaffolds; occasionally stoop, crouch, kneel, and crawl; frequently balance and climb ramps or stairs; and needed to avoid irritants such as fumes, odors, dusts, and gases. The VE testified that such a claimant could do Revels' past relevant work as a medical assistant and phlebotomist. The second hypothetical involved a claimant who was identical to the first but had bilateral manipulative limitations allowing her to frequently do activities such as reaching overhead, handling, fingering, and feeling. The VE testified that the hypothetical claimant could also work as a medical assistant and phlebotomist. The third hypothetical involved a claimant identical to the second, although the manipulative limitations were greater, allowing her to only occasionally do the highlighted activities. The VE testified that the claimant would not be able to do Revels' past relevant work of medical assistant and phlebotomist. However, this person could work as a case aid, furniture rental clerk, and dressing room or tanning salon attendant. As a final hypothetical, the ALJ asked about a claimant with the same capabilities as in the second hypothetical, but who could only do sedentary, rather than light, work. The VE testified that the claimant could work as a receptionist.

Revels' attorney also presented several hypotheticals. He first presented a hypothetical based on Revels' restrictions as described by treating rheumatologist Dr. Nolan. The VE testified that those limitations would preclude a claimant from doing any full-time work. Her attorney also asked about a claimant who needed to lie down for an average of one hour during a workday. The VE testified that this would likely preclude competitive employment because, though a typical employee is allowed an hour of break time, that time is broken up into two fifteen-minute breaks and one thirty-minute break. Finally, Revels' attorney asked about Revels'

limitations as described by physical therapist Richard Randall. The VE testified that those limitations would preclude Revels' past work and any other work.

**V.**

We conclude that in determining the intensity, persistence, and limiting effects of Revels' symptoms, the ALJ failed to provide legally sufficient reasons for rejecting the opinions of Dr. Nolan, physical therapist Richard Randall, and Nurse Practitioner Mager. He also erred in rejecting Revels' symptom testimony and the reports from her mother and father. These errors arose from an apparent fundamental misunderstanding of fibromyalgia. The ALJ failed to properly analyze Revels' fibromyalgia-related symptoms pursuant to SSR 12-2P, issued in 2012, and our court's 2004 opinion in *Benecke v. Barnhart*. This appears to be a recurrent problem. *See Weiskopf v. Berryhill*, No. 15-16008, 2017 WL 2533445, at *2 (9th Cir. June 12, 2017) ("[T]he ALJ did not properly analyze Weiskopf's evidence of fibromyalgia."); *Hamilton-Carneal v. Colvin*, 670 F. App'x 613, 613 (9th Cir. 2016) ("The ALJ therefore erred by discounting Hamilton-Carneal's 'subjective complaints and limitations' [resulting from fibromyalgia] as 'simply out of proportion to and not corroborated by the objective medical evidence.'"); *Payan v. Colvin*, 672 F. App'x 732, 732 (9th Cir. 2016) ("The ALJ failed to properly assess Payan's residual functional capacity ("RFC") in light of Social Security Ruling 12-2p."); *Benecke*, 379 F.3d at 594 ("[T]he ALJ erred in discounting the opinions of Benecke's treating physicians, relying on his disbelief of Benecke's symptom testimony as well as his misunderstanding of fibromyalgia."). In evaluating whether a claimant's residual functional capacity renders them disabled because of fibromyalgia, the

medical evidence must be construed in light of fibromyalgia's unique symptoms and diagnostic methods, as described in SSR 12-2P and *Benecke*.  The failure to do so is error, as is true here.

A. *The ALJ Erred by Giving The Medical Opinion of Treating Physician Dr. Nolan "No Weight."*

Dr. Nolan treated Revels at least twelve times between 2010 and 2012, and was thus one of Revels' treating physicians.  *See* 20 C.F.R. § 404.1527(a)(2).  In determining Revels' RFC, the ALJ gave "[n]o weight" to Dr. Nolan's medical opinion of her symptoms and her functional limitations.

Dr. Nolan's opinion of Revels' functional limitations was contradicted by the findings of Dr. Rowse and Dr. Blando, the nonexamining doctors from the state agency, and, to some extent, the opinion of Dr. Ruggeri, the hand specialist.  Therefore, in rejecting Dr. Nolan's opinion, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence.  He failed to do so.

The ALJ first stated that Dr. Nolan's opinion was "conclusory, with little explanation in how he determined the claimant's functional limitations."  However, the record demonstrates that after each of his appointments with Revels, Dr. Nolan provided a detailed account of the visit, including Revels' complaints of pain, the effectiveness of the prescribed medication or injections, and his findings on the current state of her fibromyalgia.  Moreover, along with his assessment of Revels' functional limitations, he included a two-page, single-spaced letter describing the basis for his findings.  He explained Revels' medical history, her repeated

complaints of pain, the medical evidence of fibromyalgia, her response to prescribed medications, and his analysis of other doctors' findings. Therefore, the ALJ's dismissal of Dr. Nolan's opinion as conclusory is not supported by the record.

The ALJ next found that Dr. Nolan's opinion was "inconsistent with . . . [his] own treatment notes." He stated that Dr. Nolan could not have determined that Revels was restricted in sitting, standing, or walking because his treatment notes were "invariably focused on [Revels'] experience of hand pain." However, Dr. Nolan's notes consistently discuss Revels' neck and back pain. Moreover, Dr. Nolan was treating Revels for fibromyalgia, a condition that involves "chronic pain throughout the body." *Benecke* 379 F.3d at 590.

The ALJ further erred by relying on four visits during which Dr. Nolan found that parts of Revels' body were "nontender" and that she had a "normal range of motion." Lacking certain tender points does not rule out fibromyalgia-related symptoms, since a doctor need only find eleven out of eighteen tender points to diagnose the condition. Moreover, a person with fibromyalgia may have "muscle strength, sensory functions, and reflexes [that] are normal." *Rollins*, 261 F.3d at 863 (Ferguson, J., dissenting) (quoting Yunus, *supra*, at 1260).

In addition, the ALJ rejected Dr. Nolan's opinion because it was supposedly not "supported by objective medical evidence." The ALJ pointed to several tests that yielded normal results: a nerve conduction and velocity study of Revels' hands by Dr. Ruggeri, as well as wrist X-rays and spine MRIs. He took issue with Dr. Nolan's tender-point examinations because they were "solely based on subjective

pain complaints," and he also noted that, at multiple appointments, Revels showed less than eleven out of eighteen tender points. This analysis demonstrates a fundamental lack of knowledge about fibromyalgia. Fibromyalgia is diagnosed "entirely on the basis of patients' reports of pain and other symptoms," and "there are no laboratory tests to confirm the diagnosis." *Benecke*, 379 F.3d at 590. Pursuant to SSR 12-2P, tender-point examinations themselves constitute "objective medical evidence" of fibromyalgia. *Id.* at *2–3. Moreover, the symptoms of fibromyalgia "wax and wane," and a person may have "bad days and good days." *Id.* at *6. That is why the Social Security Administration recommends looking at longitudinal records, *see id.*, as Dr. Nolan did. At five out of eight appointments, Revels had eleven or more tender points, the cutoff for a diagnosis of fibromyalgia under SSR 12-2P's first set of criteria.[4]

Finally, the ALJ stated that Dr. Nolan's findings were inconsistent with Revels' "own assertions and testimony." He pointed to Revels' remark to Dr. Ruggeri that "she was independent in daily activities," as well as Revels' testimony that she did various household tasks. However, the ALJ omitted highly relevant qualifications to this statement. For example, when Revels described to Dr. Ruggeri that she was independent, she also added that she "requires a longer time to complete tasks," and that her goal was to "return to normal activities." The record actually demonstrates that Dr. Nolan's

---

[4] The dissent defends the ALJ's finding that Revels was only partially credible and the ALJ's dismissal of the opinions of Dr. Nolan, Randall, Dr. Wolfson, and Nurse Practitioner Mager on the basis of contradictory objective tests. In so doing, like the ALJ, the dissent fails to evaluate Revels' testimony and her medical record in light of fibromyalgia's unique symptoms and diagnostic methods, as described in SSR12-2P and *Benecke*.

findings were consistent with Revels' descriptions of her daily activities.  Revels repeatedly stated—to her doctors and physical therapists, in her function reports, and at her hearing—that she struggled to complete household tasks because she needed to take numerous breaks.  Revels' ability to complete *some* household tasks was perfectly consistent with Dr. Nolan's opinion of Revels' limited functional capacity.  Dr. Nolan did not find that Revels was bedridden.  He found that she needed significant breaks when sitting or standing, and needed to recline for at least an hour each day.

The only remaining reason the ALJ gave for rejecting Dr. Nolan's opinion was the contradictory opinions of the state doctors.[5]    Both doctors found that Revels' functional limitations were significantly less than those found by Dr. Nolan.  However, the opinions of nonexamining doctors "cannot by [themselves] constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831 (emphasis in original).

Even if the ALJ had pointed to substantial evidence supporting the decision not to give Dr. Nolan's opinion controlling weight, he failed to explain why Dr. Nolan's opinion deserved "no weight" at all.  When a treating provider's opinion is not entitled to "controlling weight" because of substantial contradictory evidence, that opinion is

---

[5] The ALJ also stated that Dr. Nolan's opinion was contradicted by Dr. Cunningham and "other treating doctors," but he did not explain what he meant.  Dr. Cunningham did not provide a functional capacity evaluation, so it is unclear what discrepancy the ALJ might have been referring to.  And it is similarly unclear what "other treating doctors" the ALJ was referring to.

still "entitled to deference" based on factors such as the length and nature of the treatment relationship. *Orn*, 495 F.3d at 632–33; *see also* 20 C.F.R. § 404.1527(c). Here, there were strong reasons to defer to Dr. Nolan's opinion. Dr. Nolan had the most extensive treatment relationship with Revels. Moreover, a rheumatologist's specialized knowledge is "particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community." *Benecke*, 379 F.3d at 594 n.4. As a result, we have previously given a rheumatologist's opinion of a claimant's fibromyalgia "greater weight than those of the other physicians because it is an opinion of a specialist about medical issues related to his or her area of specialty." *Id.* (internal quotation marks omitted).

The ALJ did not provide "specific and legitimate reasons" to reject Dr. Nolan's opinion, and he failed to follow the appropriate methodology for weighting a treating physician's medical opinion. Accordingly, we conclude that the ALJ erred in giving Dr. Nolan's opinion no weight. The ALJ should have instead found it to be controlling as to the intensity, persistence, and limiting effects of Revels' fibromyalgia. Because the VE testified that a claimant with the physical limitations outlined in Dr. Nolan's medical opinion would be unable to do any full-time work, Dr. Nolan's opinion "*alone* establishes that [Revels] is entitled to benefits." *Lingenfelter*, 504 F.3d at 1041 n.12 (emphasis in original).

## B. The Agency Erred by Failing to Credit the Opinion of Nurse Practitioner Mager.

Mager is a nurse practitioner who saw Revels at least ten times between 2010 and 2012. She assisted in treating

Revels' chronic pain and referred her to pain-management specialist Dr. Doust, rheumatologist Dr. Nolan, and hand specialist Dr. Ruggeri. She consistently saw Revels during her pain treatment and received reports from the specialists. She filled out a check-the-box assessment of Revels' functional limitations which, like Dr. Nolan's assessment, indicated severe restrictions on Revels' abilities. That form was not submitted until after the ALJ's decision, but the Appeals Council considered it and made it part of the record.

Though Mager's opinion was submitted after the ALJ's decision, we may consider it in determining whether the ALJ's decision was supported by substantial evidence. *See Brewes*, 682 F.3d at 1163. Also, though Mager is not an "acceptable medical source," she is an "other source" and there are strong reasons to assign weight to her opinion. Mager was a treating source who examined Revels at least ten times over two years. *See* 20 C.F.R. § 404.1527(c)(1)–(2), (f) (explaining that an opinion from a source who has examined the claimant and had a longer treatment relationship should generally be given greater weight). Moreover, Mager was in a unique position as a primary care provider, as she received reports from specialists and had an overview of Revels' conditions. *See id.* § 404.1527(c)(2)(ii) (in determining the weight that should be given to an opinion, the ALJ should look at "the treatment the source has provided and . . . the kinds and extent of examinations and testing the source has performed or ordered from specialists"). Moreover, her check-the-box assessment was co-signed by an acceptable medical source in her clinic, Dr. Richard Wolfson. Mager's opinion thus provides additional support to our conclusion that the ALJ's rejection of Dr. Nolan's opinion was not supported by substantial evidence.

## C. The ALJ Erred by Failing to State Germane Reasons for Rejecting Physical Therapist Randall's Functional Capacity Evaluation.

Randall is a physical therapist who saw Revels once at the request of her attorney. He conducted a functional capacity evaluation and afterward prepared a nine-page report on his findings. He found that Revels had limitations similar to those found by Dr. Nolan and Mager. Even though Randall's opinion is not entitled to the same deference as "acceptable medical sources," the ALJ erroneously afforded his opinion no weight by failing to provide germane reasons for its rejection. *Molina*, 674 F.3d 1111.

First, the ALJ stated that Randall's opinion of Revels' limitations was "far beyond what is supported by objective testing." Again, this reasoning was based on a flawed understanding of fibromyalgia, which cannot be diagnosed by what the ALJ considered to be "objective testing." Second, the ALJ stated that Randall's opinion was inconsistent with those of Dr. Cunningham, Dr. Rowse, Dr. Blando, and Dr. Ruggeri. However, Dr. Cunningham never provided an evaluation of Revels' functional capacity, and though Dr. Ruggeri "encouraged" Revels to go back to work, he never opined on her specific functional limitations. While the ALJ is correct that Randall's opinion was inconsistent with the opinions of Dr. Rowse and Dr. Blando—neither of whom examined Revels—he failed to note that it was consistent with that of her treating rheumatologist, Dr. Nolan. Moreover, though Randall only examined Revels once, he examined her for three-and-a-half hours and extensively reviewed the medical records from other doctors, ultimately producing a nine-page report.

*D.  The ALJ Did Not Provide Clear and Convincing Reasons to Reject Revels' Testimony.*

Revels testified at length about her symptoms and her functional limitations.  She also completed two written function reports and submitted third-party function reports from her mother and father.  The ALJ found that Revels' "medically determinable impairments could reasonably be expected to cause the alleged symptoms," and he did not make a finding of malingering.  Nevertheless, he concluded that her symptom testimony was "not entirely credible to the extent [it was] inconsistent with the . . . residual functional capacity assessment."  He also assigned little weight to the third-party reports from Revels' mother and father.

The ALJ took a backward approach to determining Revels' credibility.  He found that Revels' testimony was not credible "to the extent [it was] inconsistent with the . . . [RFC]."  However, an ALJ must take into account a claimant's symptom testimony when determining the RFC.  *Laborin v. Berryhill*, 867 F.3d 1151, 1154 (9th Cir. 2017); *Trevizo v. Berryhill*, 862 F.3d 987, 1000 n.6 (9th Cir. 2017).  To determine the RFC *first* and *then* assess the claimant's testimony is to "put[] the cart before the horse."  *Laborin*, 867 F.3d at 1154.  The ALJ's approach is "inconsistent with the Social Security Act and should not be used in disability decisions."  *Id.* at 1153; *see also Trevizo*, 862 F.3d at 1000 n.6.  Though this may not itself be reversible error, when taken together with the ALJ's failure to provide "clear and convincing" reasons for rejecting Revels' testimony, we cannot conclude anything other than that the ALJ's failure to credit Revels' testimony was error.  Like his rejection of the opinions of Dr. Nolan and physical therapist Randall, the ALJ

did not consider Revels' testimony in light of her fibromyalgia diagnosis.

The ALJ stated that Revels' testimony was undercut by the lack of "objective findings" supporting her claims of severe pain. He highlighted several examinations that had mostly normal results, such as an X-ray and MRIs of Revels' neck and back, as well as the nerve conduction and velocity study of her hands. He also cited medical records showing that, at several doctor's appointments, Revels exhibited normal muscle strength, tone, and stability, as well as a normal range of motion. This reasoning was similar to his reasoning for rejecting Dr. Nolan's opinion, and was similarly erroneous. As described above, the examination results cited by the ALJ are perfectly consistent with debilitating fibromyalgia. The condition is diagnosed "entirely on the basis of patients' reports of pain and other symptoms," and "there are no laboratory tests to confirm the diagnosis." *Benecke*, 379 F.3d at 590. Indeed, fibromyalgia is diagnosed, in part, by evidence showing that another condition does not account for a patient's symptoms. SSR 12-2P, at *3.

The ALJ also noted that Dr. Ruggeri had encouraged Revels "to go back to some gainful work," and that Dr. Bair had asserted that Revels' feet were "fine." Neither doctor's opinion provided a legitimate reason for rejecting Revels' testimony. Dr. Ruggeri's offhand recommendation that Revels go back to work was based on his examination of her hands, and Dr. Bair's evaluation only pertained to her feet. Neither evaluated Revels' fibromyalgia. Therefore, their opinions merited much less weight than Dr. Nolan's, who specifically treated Revels for fibromyalgia, and whose medical opinion matched Revels' testimony. *See* 20 C.F.R. § 404.1527(c)(2)(ii) ("For example, if your ophthalmologist

notices that you have complained of neck pain during your eye examinations, we will consider his or her medical opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.").

The ALJ also erred in rejecting Revels' testimony on account of the supposedly "conservative" treatment she received. Any evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated. Revels received facet and epidural injections in her neck and back, as well as steroid injections in her hands. She was prescribed a variety of medications for her pain, including Valium, Vlector, Soma, Vicodin, Percocet, Neurontin, Robaxin, Trazodone, and Lyrica. The ALJ provided no explanation why he deemed this treatment "conservative" for fibromyalgia. We have previously "doubt[ed] that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment." *Garrison*, 759 F.3d at 1015 n.20. Further, Revels' treatment was significantly more aggressive than the type of fibromyalgia treatment we found to be conservative in *Rollins v. Massanari*.[6]

---

[6] In *Rollins*, we found the treatment conservative only after noting that the doctor had primarily recommended that the petitioner "avoid strenuous activities." 261 F.3d at 856. Moreover, *Rollins'* analytical approach to fibromyalgia disability claims is now questionable. We decided that case eleven years before SSR 12-2P, when it was still unclear whether fibromyalgia could "constitute a qualifying 'severe impairment' under the Act." *Id.* at 857. We only assumed, for the purposes of the opinion, that it was. In light of SSR 12-2P and our opinion in *Benecke*, 379 F.3d 587, fibromyalgia is now unquestionably a qualifying impairment. Additionally, we did not acknowledge in *Rollins* that fibromyalgia symptoms wax and wane, and that a person suffering from the disease may not display symptoms ordinarily associated with joint and muscle pain. Our failure to do so was contrary to the more-developed, later

Finally, the ALJ erred in finding that there was "wide disparity" between Revels' symptom testimony and her reports of her daily activities. Though inconsistent daily activities may provide a justification for rejecting symptom testimony, "the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability." *Benecke*, 379 F.3d at 594 (alteration in original) (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)). A claimant "does not need to be utterly incapacitated in order to be disabled." *Id.* (quoting *Vertigan*, 260 F.3d at 1050). The ALJ relied on Revels' function report in which she listed a number of activities she might do in a day: using the bathroom, brushing her teeth, washing her face, taking her children to school, washing dishes, doing laundry, sweeping, mopping, vacuuming, going to a doctor's appointment for her or for one of her children, visiting her mother and father, cooking, shopping, getting gas, and feeding her dogs. He failed to acknowledge that, over and over in the same report, Revels explained that she could complete only some of the tasks in a single day and regularly needed to take breaks—which was consistent with her symptom testimony. Further, Revels' description of her daily activities differed in large measure from the petitioner's in *Rollins*. There, we rejected the petitioner's testimony regarding her fibromyalgia-related symptoms because she "was equivocal about how regularly she was able to keep up with all of [her] activities." 261 F.3d at 857. Revels, however, repeatedly and consistently

---

knowledge about fibromyalgia set forth in SSR 12-2P and *Benecke*, both of which recognize that an ALJ must evaluate the record in light of the unique characteristics of fibromyalgia.

described the severe limitations on her ability to complete daily activities.[7]

Consequently, the ALJ failed to meet the high bar for rejecting a claimant's symptom testimony.  For similar reasons, he erred in assigning little weight to the reports submitted by Revels' mother and father.  He found that their reports were inconsistent with objective medical evidence and with Revels' description of her daily activities.  As described above, that reasoning was erroneous, and not only does it not constitute "clear and convincing" evidence for rejecting Revels' testimony, it does not constitute "germane" reasons for rejecting the third-party function reports of Revels' mother and father.

## VI.

"The decision whether to remand a case for additional evidence, or simply to award benefits[,] is within the discretion of the court."  *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (remanding for determination of benefits where the panel was "convinced that substantial evidence does not support the Secretary's decision, and because no legitimate reasons were advanced to justify disregard of the treating physician's opinion").  "[I]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded" for further proceedings.  *Garrison*, 759 F.3d at 1019 (quoting *Lewin v.*

---

[7] The ALJ also stated that Revels was not credible because she inconsistently reported her marijuana usage and her pain levels.  On appeal, the Commissioner does not defend either as a valid ground for rejecting Revels' symptom testimony, and thus we do not address them here.

*Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)). Generally, however, where "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand," *id.* at 1020, we remand for an award of benefits.[8]

We find that each of these credit-as-true factors is satisfied and that remand for the calculation and award of benefits is warranted. First, the record has been fully developed. It includes treatment notes from over fifty medical visits from 2010 to 2012, as well as additional medical records stretching back to 2002. It contains functional capacity assessments from two treating providers and two nonexamining doctors. It also includes Revels' testimony about the severity of her symptoms, two function reports filled out by Revels, and function reports filled out by her mother and her father. Most importantly, the VE was asked hypotheticals about the ability of an individual with Revels' physical limitations as described by Dr. Nolan, and testified that those limitations were inconsistent "with the performance of [Revels'] past work or any other full-time work."

The other two credit-as-true factors are also satisfied. The ALJ failed to provide legally sufficient reasons for rejecting

---

[8] In rare instances, though each of the credit-as-true factors is met, the record as a whole leaves serious doubt as to whether the claimant is actually disabled, *see Garrison*, 759 F.3d at 1021, in which case we remand for further development of the record.

the medical opinion of Revels' treating rheumatologist and for rejecting Revels' testimony about her symptoms. He also erred in rejecting the medical opinion of Revels' physical therapist and in rejecting the lay opinions of Revels' mother and father. If credited as true, Dr. Nolan's opinion establishes that Revels is disabled, because the VE testified that someone with the limitations established by Dr. Nolan could not work. Further, there is no "serious doubt" that, based on "the record as a whole," Revels is in fact disabled. Her impairment of fibromyalgia has been repeatedly substantiated by tender-point examinations, which SSR 12-2P establishes as proper evidence of the condition. Moreover, Revels' testimony, her function reports, and the treatment notes from her doctors consistently show that she was suffering from severe pain.[9]

We therefore reverse the judgment of the district court with instructions to remand to the ALJ for the calculation and award of benefits.

**REVERSED; REMANDED WITH INSTRUCTIONS.**

---

[9] Because we find that the record on appeal establishes Revels' disability and functional limitations, we need not reach Revels' contention that the Appeals Council erred in failing to include additional evidence in the administrative record.

KLEINFELD, Senior Circuit Judge, dissenting:

I respectfully dissent. The ALJ's credibility determination was adequately supported.[1] Even if we might disagree with his finding that Revels could perform light work, it was nevertheless supported by "substantial evidence."[2]

## I.

This case does not turn on whether Revels has fibromyalgia. Instead, the issue is Revels' "residual functional capacity." Based on the evidence in the record, the ALJ found that Revels could perform light work. In so doing, he found that Revels' "statements concerning the intensity, persistence and limiting effects" of her fibromyalgia were "not entirely credible" because they were inconsistent with medical evidence and her own testimony.

According to the majority, this was incorrect because Social Security Ruling 12-2p[3] says that fibromyalgia is actually *characterized* by inconsistent symptoms. But the

---

[1] *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *see also Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1225 (9th Cir. 2010) (upholding a partial credibility finding because of discrepancies in the claimant's testimony).

[2] *See Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990) ("Substantial evidence means more than a mere scintilla, but less than a preponderance.") (citations and quotation marks omitted).

[3] 77 Fed. Reg. 43,640 (July 25, 2012).

majority errs because it reads Ruling 12-2p too broadly and because it gives short shrift to *Rollins v. Massanari*.[4]

**A.**  Ruling 12-2p provides extensive guidance about what constitutes a fibromyalgia *diagnosis*.[5]   It notes that fibromyalgia symptoms often come and go.  But when it comes to the *residual functional capacity* of a person with fibromyalgia, this is what Ruling 12-2p says: "For a person with [fibromyalgia], we will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'"[6]  And when it comes to evaluating "the intensity and persistence" of a person's symptoms, Ruling 12-2p says that the ALJ considers "all of the evidence in the case record" if the claimant's testimony is not backed up by "objective medical evidence."[7]

The ALJ's determination that Revels can perform light work is consistent with Ruling 12-2p.  The record spans a thousand pages and describes multiple doctors treating and examining Revels between 2010 and 2012.  That counts as a "longitudinal record."  Based on that record, the ALJ found Revels to be only partially credible because objective tests—like Dr. Ruggeri's analysis of her hand functioning—contradicted Revels' own function reports. That is *not* the same as saying that Revels is only partially

---

[4] 261 F.3d 853 (9th Cir. 2001).

[5] *See* 77 Fed. Reg. at 43,641–43.

[6] *Id.* at 43,644.

[7] *Id.* at 43,643.

credible because her symptoms were inconsistent over time. Revels' symptoms may "wax and wane," but having good days and bad days does not contradict the ALJ's findings that she had enough capacity to perform light work.

**B.**   Not only is the ALJ's credibility determination consistent with Ruling 12-2p, but it is also supported by precedent.

In *Rollins v. Massanari*, we assumed without deciding that Rollins had a severe impairment of fibromyalgia.[8]  We then held that when determining functional capacity, Rollins' subjective pain testimony could be discounted by her "testimony about her daily activities, such as attending to the needs of her two young children, cooking, housekeeping, laundry, shopping, attending therapy and various other meetings every week, and so forth."[9]  This was despite the fact that Rollins was "somewhat equivocal about how regularly she was able to keep up with all of these activities."[10]

*Rollins* controls here.  Revels believes that her pain and need for breaks during daily activities means that she lacks the capacity for light work.  But even though she may have to take breaks in her chores, it was permissible for the ALJ to find that Revels' activity level is inconsistent with the severe pain that she describes.  Revels describes her pain as being a constant 7 out of 10, sometimes increasing to 8, 9, or even

---

[8] 261 F.3d at 857.

[9] *Id.*

[10] *Id.*

"greater than 10." To a doctor, that means that Revels experienced constant "severe" pain, sometimes increasing to the "worst pain imaginable."[11] It was reasonable to infer that someone in that much pain cannot clean a house or take care of infants, even with breaks. This inference is supported by Dr. Rowse's statement that Revels' claims were inconsistent with her activities. The ALJ discussed Revels' inconsistencies in his decision, thus giving compelling reasons for partially discounting her testimony.

Despite the majority's statement to the contrary, *Rollins*'s approach is not "questionable." It is irrelevant that *Rollins* was decided before Ruling 12-2p was issued. Even if Ruling 12-2p had been in effect, *Rollins* would have been decided the same way: Rollins would have met the requirements for a fibromyalgia diagnosis, but her residual functional capacity would have shown that she could still perform some work.

## II.

Just as the ALJ properly found that Revels was not wholly credible, he also permissibly dismissed medical testimony supporting Revels' position.

Revels' examining physician, Dr. Nolan, provided only conclusory reasons for his findings, and almost all of his opinions were check-box forms. His description of Revels' medical issues was also contradicted by objective medical

---

[11] Harald Breivik et al., *Assessment of pain*, 101 BRIT. J. OF ANAESTHESIA 17, 18 (2008); *see* CHRIS PASERO & MARGO MCCAFFERY, PAIN ASSESSMENT AND PHARMACOLOGIC MANAGEMENT 56 (2011); Amelia Williamson & Barbara Hoggart, *Pain: a review of three commonly used pain rating scales*, 14 J. CLINICAL NURSING 798, 799–800 (2005).

evidence and Revels' own activity levels. And "when evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings."[12]

The findings of Revels' physical trainer, Richard Randall, were not supported by objective medical tests, and they were contradicted by Dr. Ruggeri's opinion. Also, Randall is not an "acceptable medical source" under the Social Security regulations,[13] so he is not entitled to the same deference that a physician receives.[14]

The questionnaire signed by Dr. Wolfson and Nurse Practitioner Jacqueline Mager was a check-box form that is contradicted by objective medical evidence and Revels' ability to perform tasks like cleaning and caring for her grandchildren. Because Ms. Mager is a nurse practitioner, her opinion also receives less deference than a physician's (at least to the extent she did not work under Dr. Wolfson's "close supervision").[15]

---

[12] *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *see also Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (holding that an ALJ "permissibly rejected" three psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions").

[13] 71 Fed. Reg. 45,593, 45,594 (Aug. 9, 2006); *see also* 82 Fed. Reg. 5,844, 5,846–47 (Jan. 18, 2017).

[14] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[15] *Id.*; 71 Fed. Reg. at 45,594. The new rule defining nurse practitioners as "acceptable" sources had not yet taken effect. *See* 82 Fed. Reg. at 5,844, 5,846.

The ALJ therefore gave each of these testimonies its due.

## III.

Revels evidently has fibromyalgia. She doubtless feels pain or discomfort much of the time. Whether its severity prevents her from working is a question different from whether she has the disease. Medical conditions affect different people differently, and just because someone says they feel excruciating pain does not make it so. In this appeal, Revels does not establish that the ALJ's conclusions were unsupported by substantial evidence. We should have affirmed the ALJ's decision.

Therefore, I respectfully dissent.